1

10:09:11    ROUGH DRAFT:  STPHAOEUFPLT read and sign

10:10:47    STPHAOEUFPLT

10:10:48                          *****

                    DIRECT EXAMINATION BY MR. DUDA

10:11:02        Q.   Good morning.

10:11:03        A.   Good morning.

10:11:04        Q.   Just to get started, would you state

10:11:07    your name -- actually, could you spell it?

10:11:10        A.   Michalina Centofanti spelled M I C H A L

10:11:16    I N A, last name C E N T O F A N T I.

10:11:24        Q.   Have you ever had your deposition taken

10:11:36    before?

10:11:36        A.   No.

10:11:36        Q.   This is not a marathon or an endurance

10:11:42    test.  If you want to take a break, let me know.

10:11:45    There can be various reasons you want the take a

10:11:47    break, let me know and we'll stop.  If you don't

10:11:50    understand one of my questions or if it's vague or

10:11:53    you just don't get it, be sure to ask me to repeat

10:11:56    it or explain to be sure you understand the

10:12:00    question I'm asking, okay?

10:12:01        A.   Okay.

10:12:02        Q.   You're here in response to this

10:12:08    deposition notice, is that correct?

                    PERLIK and COYLE REPORTING

2

10:12:16       A.    (Witness examining document.)  Yes.

10:12:34               MR. DUDA:  Let's mark this as

10:12:36   Exhibit 1.

                       (Defendant's Deposition Exhibit
                        No. X offered and marked.)
10:13:05

10:13:08       Q.    (BY MR. DUDA)  Do you work for National

10:13:12   Nonwovens?

10:13:12       A.    Yes.

10:13:12       Q.    What is your position with National

10:13:15   Nonwovens?

10:13:15       A.    Vice president of corporate

10:13:19   administration.

10:13:19       Q.    What are your duties as vice president

10:13:21   of corporate administration?

10:13:23       A.    Primary duties are two-fold.  First,

10:13:27   human resources, second, marketing.

10:13:30       Q.    How long have you held that position?

10:13:36       A.    Approximately ten years.

10:13:38       Q.    Did you have a position with the company

10:13:42   prior to that?

10:13:43       A.    Yes.

10:13:43       Q.    What was that position?

10:13:45       A.    Corporate administrator.

10:13:46       Q.    What were your duties as corporate

3

10:13:49   administrator?

10:13:49       A.   Primarily human resource.

10:13:55       Q.   By human resource, does that include

10:13:59   hiring people and dealing with personnel issues,

10:14:02   those types of things?

10:14:03       A.   Yes.

10:14:03       Q.   Did that involve marketing at all --

10:14:07   marketing of aproduct, sales of any product?

10:14:10       A.   No.

10:14:10       Q.   How long did you hold that position?

10:14:20       A.   Approximately two years.

10:14:22       Q.   Did you have a position with the company

10:14:25   prior to that?

10:14:25       A.   No.

10:14:26       Q.   Were you employed prior to that?

10:14:30       A.   Yes.

10:14:30       Q.   Where were you employed prior to that?

10:14:32       A.   Poly bond.

10:14:34       Q.   Where is poly bond?

10:14:37       A.   Poly bond was located in -- the

10:14:45   corporate location was in Charlotte, North

10:14:49   Carolina.

10:14:49       A.   Is that where you were located.

10:14:51       Q.   Yes?

PERLIK and COYLE REPORTING

4

10:14:55      Q.   I assume you've been with National

10:14:58   Nonwovens for twelve years?

10:14:59      A.   Correct.

10:14:59      Q.   For those twelve years have you been in

10:15:02   Easthampton or have you been in more than one

10:15:04   place?

10:15:04      A.   In Easthampton.

10:15:05      Q.   So when you came to National Nonwovens,

10:15:11   moved up to the Easthampton area?

10:15:14      A.   Correct.

10:15:16      Q.   What did you do for poly bond?

10:15:18      A.   I worked as an executive assistant.

10:15:21      Q.   What does poly bond do?

10:15:25      A.   They manufacture nonwoven, technology is

10:15:31   spun bond technology.

10:15:40      Q.   What is spun bond?

10:15:43      A.   It's a technology where you melt polymer

10:15:50   down into spaghetti and it gets molded into a

10:15:56   light weight nonwoven.

10:15:58      Q.   When you say nonwoven, is that a felt

10:16:05   type material?

10:16:05      A.   No.

10:16:06      Q.   It's not?  Can you explain it just a

10:16:09   little bit more what it is?

PERLIK and COYLE REPORTING

5

10:16:10    A.    Nonwoven is an industry, spun bond is a

10:16:18    technology of the nonwoven industry.

10:16:20    Q.    What does nonwovens encompass?  Maybe

10:16:26    that's my problem.

10:16:27    A.    It's defined as the manufacturing of

10:16:31    materials not using the we'ving process.

10:16:38    Q.    So nonwovens can include anything that

10:16:43    not woven, that doesn't use a weaving process.

10:16:49    What about rayon, is that -- is rayon considered a

10:16:53    nonwoven material?

10:16:55    A.    Rayon is considered a fiber.

10:16:57    Q.    Other than wool felt, can you give me a

10:17:06    couple of other examples that are nonwoven?

10:17:10              MR. DIONNE:  You mean felted wool?

10:17:38              THE WITNESS:  Could you repeat the

10:17:40    question.

10:17:40    Q.    (BY MR. DUDA)  Other than wool felt or

10:17:43    felted wool, what are some examples of nonwoven

10:17:48    materials?

10:17:48    A.    Spun bond, melt blown, needle punch, air

10:18:11    laid.

10:18:12    Q.    L A Y E D?

10:18:13    A.    L A I D.

10:18:15    Q.    Sorry; of course.

6

10:18:17    A.    Chemical bond.

10:18:24    A.    Thermal bond and you had mentioned other

10:18:29    than felted wool.

10:18:39    Q.    Poly bond in char lot where you used to

10:18:42    work made just spun bond?

10:18:44    A.    Correct.

10:18:44    Q.    Is that a material that's still sold,

10:18:55    today?

10:18:55    A.    Yes.

10:18:56    Q.    These various materials that you just

10:19:00    listed as nonwoven materials, those are all in the

10:19:06    market today also?

10:19:07    A.    Yes.

10:19:07    Q.    How long were you with poly bond?

10:19:15    A.    Approximately two years.

10:19:17    Q.    Were you employed prior to poly bond?

10:19:23    A.    Yes.

10:19:24    Q.    Where were you before that?

10:19:25    A.    South land corporation.

10:19:33    Q.    South land corporation; that's familiar?

10:19:40    A.    They own seven eleven.

10:19:49    Q.    Where were you located when you worked

10:19:51    for south land corporation?

10:19:52    A.    Middletown Connecticut.

PERLIK and COYLE REPORTING

7

10:19:54    Q.   What was your position at south land?

10:19:56    A.   Executive assistant.

10:19:57    Q.   How long were you there?

10:19:59    A.   I don't recall.

10:20:03    Q.   Approximately, again.  This isn't a

10:20:08    test?  A year, ten years?

10:20:10    A.   Approximately two years.

10:20:13    Q.   Just to finish this out, were you

10:20:16    employed before south land corporation?

10:20:18    A.   Yes.

10:20:18    Q.   Who were you with?

10:20:20    A.   T E X T E C H corporation.

10:20:30    Q.   Spelled T-E-X-T-E-C-H?

10:20:32    A.   Yes.

10:20:33    Q.   Where were you working when you were

10:20:35    with Textech industries?

10:20:37    A.   Middletown, Connecticut.

10:20:39    Q.   Are you from Connecticut?

10:20:40    A.   No.

10:20:41    Q.   Where are you from?

10:20:42    A.   Originally?

10:20:43    Q.   Yes.

10:20:44    A.   Wallingford, Connecticut.

10:20:47    Q.   What was your position at Textech?

8

10:20:51        A.    Executive assistant.

10:20:53        Q.    How long were you with them, with

10:20:55    Textech industries?

10:20:58        A.    I don't recall.

10:20:58        Q.    In a year time frame, five years, six

10:21:05    months?

10:21:05        A.    Approximately two years.

10:21:06        Q.    Before that?

10:21:10        A.    Walace Silversmiths.

10:21:20        Q.    In where?

10:21:21        A.    Wallingford, Connecticut.

10:21:25        Q.    How long were you with W A L L A C E

10:21:30    silver Smiths, approximately?

10:21:32        A.    Four years.

10:21:33        Q.    What was your position there?

10:21:34        A.    I don't recall the exact title.

10:21:45        Q.    What were your duties, what did you do

10:21:47    there?

10:21:48        A.    Worked in accounting.

10:21:49        Q.    Have you had accounting duties

10:21:58    subsequent to W A L L A C E?  For example, at

10:22:02    Textech industries, did you have accounting

10:22:04    duties?

10:22:05        A.    No.

9

10:22:05     Q.   What about any of the other positions

10:22:07  you've been in since?

10:22:08     A.   No.

10:22:08     Q.   Were you employed before W A L L A C E

10:22:12  silver Smiths.  I know you have to be pretty young

10:22:16  by this point but were you employed prior to

10:22:20  Wallace silver Smiths?

10:22:23     A.   Yes.

10:22:24     Q.   Where did you work?

10:22:25     A.   A F C O finance.

10:22:28     Q.   In Wallingford?

10:22:30     A.   No; that was in Hartford, Connecticut.

10:22:32     Q.   How long were you with A F C O,

10:22:35  approximately?

10:22:35     A.   Six months.

10:22:36     Q.   What did you do for A F C O?

10:22:39     A.   I was a secretary.

10:22:41     Q.   Were you employed before that?

10:22:43     A.   Yes.

10:22:45     Q.   Who did you work for before that?

10:22:48     A.   K-Mart.

10:23:00     Q.   This had to be in Wallingford?

10:23:03     A.   Correct.

10:23:04     Q.   You had to be in high school?

10:23:05        A.    Correct.

10:23:06        Q.    Did you go to school at all since high

10:23:10   school?

10:23:10        A.    Yes.

10:23:11        Q.    Maybe working backwards, chronologically

10:23:16   since high school, summarize your formal

10:23:20   education?

10:23:21        A.    College education, Middlesex college.

10:23:29        Q.    Did you get a degree from Middlesex?

10:23:32        A.    No.

10:23:33        Q.    How long were you at Middlesex?

10:23:35        A.    Two years.

10:23:36        Q.    Were you working during that time?

10:23:43        A.    Yes.

10:23:43        Q.    You worked for A F C O?

10:23:46        A.    Yes.

10:23:46        Q.    And W A L L A C E silver Smiths, I

10:23:51   guess?

10:23:52        A.    No.

10:23:52        Q.    Around the time you were going to

10:23:55   college at Middlesex, you were working for A F C O

10:24:00   finance.  After you left Middlesex college, you

10:24:02   started working for W A L L A C E silver Smiths?

10:24:06        A.    Yes.

10:24:13     Q.   How was it that you came to go from

10:24:16     south land corporation to poly bond in Charlotte,

10:24:25     North Carolina?  How did you find out about the

10:24:28     job, what were the circumstances of that change

10:24:31     from Middletown, Connecticut working for south

10:24:35     land corporation to poly bond in Charlotte, North

10:24:39     Carolina?

10:24:39     A.   How did I find out?  Please explain.

10:24:46     Q.   I was hoping to just get a quick summary

10:24:49     on this but I can ask a series of questions.  How

10:24:52     did you first find out about the job at poly bond

10:24:57     in Charlotte, North Carolina?

10:24:59     A.   I was asked to relocate down to

10:25:06     Charlotte, North Carolina.

10:25:09     Q.   Who was it that did the asking?

10:25:12     A.   My husband.

10:25:12     Q.   Did your husband get a job down in

10:25:17     Charlotte, North Carolina and he asked you to come

10:25:20     along while he relocated also?

10:25:22     A.   Yes.

10:25:23     Q.   Did he also go to work with poly bond?

10:25:26     A.   Yes.

10:25:26     Q.   What was his position with poly bond in

10:25:29     Charlotte, North Carolina?

12

10:25:31      A.   Vice president.

10:25:33      Q.   Were you married to him before you

10:25:42   started working for south land corporation?

10:25:44      A.   No.

10:25:44      Q.   Did you get married in Connecticut?

10:25:52      A.   No.

10:25:52      Q.   You were married in North Carolina?

10:25:54      Q.   Where did you get married?

10:25:55      A.   Hawaii.

10:25:57      Q.   Where in Hawaii?

10:26:01      A.   M A U I.

10:26:02      Q.   Did you get married while you were

10:26:04   working for south land corporation or did you get

10:26:07   married while you were working for poly bond?

10:26:10      A.   While I was at poly bond.

10:26:12      Q.   What's your husband's name?

10:26:18      A.   Anthony Centofanti.

10:26:20      Q.   Your husband is the president of

10:26:29   National Nonwovens?

10:26:30      A.   Correct.

10:26:30      Q.   Then why was it that you moved from

10:26:43   Charlotte, North Carolina to Massachusetts?

10:26:48      A.   Job opportunity.

10:26:49      Q.   How did you find out about the job

13

10:26:57    opportunity?

10:26:57         A.    Through my husband.

10:26:59         Q.    How did that happen?

10:27:01         A.    He was contacted by the owners at the

10:27:09    time of National Felt.

10:27:16         Q.    Did he purchase National Felt, that it

10:27:18    was called at that time, did he purchase the

10:27:21    company at that time?

10:27:21         A.    No.

10:27:21         Q.    So he came up to assume what position?

10:27:22         A.    President.

10:27:24         Q.    Let me make sure I understand this.

10:28:01    When you first moved up to Massachusetts and began

10:28:04    working with National Nonwovens, your position was

10:28:06    corporate administrator?

10:28:07         A.    Correct.

10:28:07         Q.    What were your duties as corporate

10:28:10    administrator?

10:28:10         A.    Human resources.

10:28:11         Q.    Just human resources?

10:28:13         A.    Yes.

10:28:13         Q.    And that position did not involve

10:28:16    marketing or sales?

10:28:17         A.    Correct.

PERLIK and COYLE REPORTING

14

10:28:17      Q.   But then you became -- after

10:28:22   approximately two years, you became vice

10:28:24   president, corporate administration and that

10:28:26   position had some marketing responsibilities?

10:28:28      A.   Correct.

10:28:29      Q.   Could you describe, just generally, what

10:28:33   those marketing responsibilities were at the time

10:28:35   you assumed them?

10:28:36      A.   Analyzing sales statistics, reviewing

10:28:50   literature, advertising, trade shows.

10:28:59      Q.   Did you say reviewing advertising

10:29:01   literature?

10:29:04      A.   Correct.

10:29:06      Q.   Were you involved in developing

10:29:08   advertising for the company?

10:29:09      A.   Yes.

10:29:10      Q.   You would go to trade shows?

10:29:16      A.   Yes.

10:29:18      Q.   Have you maintained those

10:29:25   responsibilities for the past ten years?

10:29:27      A.   Yes.

10:29:27      Q.   Any other marketing responsibilities

10:29:32   besides advertising, trade shows and statistical

10:29:38   analysis?

PERLIK and COYLE REPORTING

10:29:39      A.    Website.

10:29:50      Q.    When you say Website, do you mean

10:29:52  Website development?

10:29:53      A.    Correct.

10:29:54      Q.    Did you work with another company in

10:29:56  developing a Website for National Nonwovens?

10:29:58      A.    No.

10:29:59      Q.    You did it on your own?

10:30:01      A.    I had hired an employee.

10:30:03      Q.    Who was that employee?

10:30:05      A.    Marketing coordinator.

10:30:12      Q.    What was his or her name?

10:30:14      A.    C R I S T I N, R U G E.

10:30:25      Q.    C R I S T I N?

10:30:28      A.    Correct.

10:30:28      Q.    So the development of the National

10:30:39  Nonwovens Website was done primarily by Cristin

10:30:45  Ruge and yourself?

10:30:46      A.    Correct.

10:30:46      Q.    Anybody else participate in that?

10:30:48      A.    Initially, a company named pets all.

10:30:59      Q.    How do you spell pets all?

10:31:00      A.    P E T Z O L D.

10:31:10      Q.    Pets sold, anything after that?

PERLIK and COYLE REPORTING

10:31:14     A.   I don't know.

10:31:15     Q.   Where is pets sold located, do you know?

10:31:18     A.   I don't know.

10:31:19     Q.   Somewhere in the United States?

10:31:20     A.   Massachusetts.

10:31:21     Q.   Other than Cristin Ruge and pets sold,

10:31:35   anyone else work on the Website?

10:31:37     A.   No.

10:31:37     Q.   Do you have a staff that works with you

10:31:46   in the marketing of products for National

10:31:49   Nonwovens?

10:31:49     A.   Yes.

10:31:49     Q.   Currently, who is that staff?

10:31:52     A.   A marketing assistant.

10:31:54     Q.   One marketing assistant?

10:31:57     A.   Correct.

10:31:58     Q.   Who is that person?

10:32:00     A.   Sandra Daigle A I G L E.

10:32:13     Q.   D A?

10:32:13     A.   I G L E.

10:32:15     Q.   How long has Sandra Daigle been your

10:32:23   marketing assistant.   Approximately two years?

10:32:25     Q.   Did you have a marketing assistant prior

10:32:29   to Sandra Daigle assuming those responsibilities?

17

10:32:34          A.    Yes.

10:32:42          Q.    Who was that?

10:32:43          A.    I don't recall her name.

10:32:48          Q.    Do you have records at the office where

10:32:52    you could find that out?

10:32:53          A.    Right.

10:32:53          Q.    How long was she there?

10:32:55          A.    I don't recall.

10:32:56          Q.    Due know approximately?

10:32:57          A.    No.

10:33:07          Q.    Did you have more than one marketing

10:33:09    assistant prior to Sandra Daigle?

10:33:12          A.    Yes.

10:33:13          Q.    Who else was there?

10:33:15          A.    I don't recall the sequence of the

10:33:33    hires.

10:33:33          Q.    You've have several marketing

10:33:36    assistants?

10:33:36          A.    Correct.

10:33:36          Q.    Do you know how many marketing

10:33:38    assistants you've had in your ten years in your

10:33:43    current position?

10:33:45          A.    Approximately three.

10:33:56          Q.    So Sandra Daigle and two other ones or

PERLIK and COYLE REPORTING

18

10:34:03   Sandra Daigle plus three other ones?

10:34:07       A.   I'm not sure.

10:34:09             MR. DIONNE:  Don't guess.  We don't

10:34:11   want you guessing.

10:34:12             THE WITNESS:  I'm not sure.

10:34:13       Q.   (BY MR. DUDA)  Two or three?  Okay.  Was

10:34:23   there a predecessor to Cristin Ruge as marketing

10:34:27   coordinator?

10:34:28       A.   Yes.

10:34:28       Q.   When did Cristin Ruge start,

10:34:31   approximately, with the company?

10:34:33       A.   Approximately five years ago.

10:34:38       Q.   Do you recall who Cristin Ruge's

10:34:47   predecessor was?

10:34:49       A.   Yes.

10:34:49       Q.   Who was Cristin Ruge's predecessor?

10:34:53       A.   A N D R E A V.

10:34:57       Q.   Do you recall how to spell the last

10:35:00   name?

10:35:00       A.   No.

10:35:01       Q.   Can you give me -- this time I'm going

10:35:04   to ask you to guess the best you can?

10:35:08       A.   V O R E B E J.

10:35:19       Q.   Vorebej?

19

10:35:21      A.   Yes.

10:35:21      Q.   How long did Ms. Vorebej work for you as

10:35:26   marketing coordinator?

10:35:27      A.   I don't recall.

10:35:28      Q.   Did you have any other marketing

10:35:30   coordinator besides Ms. Vorebej and Ms. Ruge?

10:35:41      A.   I don't recall.

10:35:42      Q.   Did Ms. Vorebej also work on the Website

10:35:46   development.  No?

10:35:46      Q.   What other duties -- let's start with

10:35:55   Ms. Ruge.  What other duties has Ms. Ruge had as

10:36:02   marketing coordinator, other than Website

10:36:02   development?

10:36:02      A.   Creation of product literature, trade

10:36:11   show involvement.

10:36:17      Q.   Helping at trade shows?

10:36:18      A.   Correct.

10:36:19      Q.   Ms. Ruge would actually design marketing

10:36:25   literature?

10:36:25      A.   Yes.

10:36:27      Q.   Did you also design marketing

10:36:29   literature?

10:36:30      A.   Yes.

10:36:30      Q.   Other than creation of or development of

PERLIK and COYLE REPORTING

10:36:44    marketing literature and trade show assistance,

10:36:52    what other responsibilities has Ms. Ruge had?

10:36:55        A.    Contact with designers and customers.

10:37:05        Q.    Contact -- is that sales contact?  When

10:37:13    you say contact, what does that mean?

10:37:15        A.    Verbal contact.

10:37:18        Q.    Is that answering the telephone?

10:37:20        A.    No.

10:37:21        Q.    With a kind of verbal contact?

10:37:23        A.    At trade shows, she would talk with

10:37:29    customers or designers.

10:37:31        Q.    About your product?

10:37:37        A.    Yes.

10:37:39        Q.    Does she go on sales trips?  Does she

10:37:48    visit customers at their location -- has she

10:37:51    visited customers at their location?

10:37:53        A.    Could you repeat the question.

10:37:54        Q.    Has she gone to visited customers of

10:37:59    National Nonwovens at customer locations?

10:38:01        A.    No.

10:38:02        Q.    She doesn't do any sales calls in terms

10:38:04    of actually physically showing up at customers'

10:38:08    place of business?

10:38:09        A.    No.

10:38:09      Q.   Does she do telephone calls with

10:38:14   customers?

10:38:14      A.   Yes.

10:38:15      Q.   Does she design literature for the trade

10:38:26   shows?

10:38:26      A.   Yes.

10:38:28      Q.   Does she do marketing research?

10:38:48      A.   Yes.

10:38:48      Q.   Does Cristin Ruge have an assistant?

10:39:15      A.   No.

10:39:15      Q.   Does she have a secretary?

10:39:17      A.   No.

10:39:17      Q.   Do you have a secretary?

10:39:19      A.   Yes.

10:39:19      Q.   Who is your secretary?

10:39:22      A.   M I C H E L L E, D.

10:39:27      Q.   How do you spell that?

10:39:28      A.   D Z I A L O.

10:39:35      Q.   How long has she been your secretary?

10:39:39      A.   I don't recall.

10:39:45      Q.   Approximately?

10:39:52      A.   Six months.

10:39:53      Q.   Who was M I C H E L L E predecessor as

10:39:59   your secretary?

PERLIK and COYLE REPORTING

10:40:00      A.   R E N E parker.

10:40:04      Q.   How long was Ms. Parker your secretary,

10:40:07   approximately?

10:40:07      A.   Two years.

10:40:07      Q.   Before Ms. Parker?

10:40:10      A.   I don't recall.

10:40:14      Q.   Do you recall how long that predecessor

10:40:22   was there, approximately?

10:40:24      A.   No.

10:40:24      Q.   A year, five years, closer to one year,

10:40:29   closer to five years?

10:40:37           MR. DIONNE:  Don't guess.  If you

10:40:39   don't know, say that you don't know.

10:40:40      Q.   (BY MR. DUDA)  Or you can just tell me

10:40:43   that you're guessing?

10:40:44           MR. DIONNE:  No; don't guess.

10:40:46      Q.   (BY MR. DUDA)  You don't recall?  You

10:40:48   don't know whether it was closer to five years or

10:40:50   one year?

10:40:50      A.   I don't recall.

10:40:54      Q.   Did you have more than one secretary

10:41:02   before R E N E parker, yes?

10:41:06      Q.   How many secretaries?

10:41:08      A.   I don't recall.

23

10:41:09       Q.    Other than Cristin Ruge, Sandra Daigle

10:41:42    and yourself, is anybody else involved in

10:41:45    marketing a product for National Nonwovens?

10:41:46       A.    Explain the question.

10:41:56       Q.    Do you know what marketing means?

10:42:00       A.    Yes.

10:42:00       Q.    What's your understanding of marketing

10:42:04    with respect to National Nonwovens?

10:42:05       A.    Marketing is promoting National

10:42:18    Nonwovens' product.  It can include many areas.

10:42:23       Q.    Other than the three people I just

10:42:28    named, is anybody else involved in promoting

10:42:31    National Nonwovens' products?

10:42:35       A.    I need you to -- can you be more

10:42:46    specific on what you're asking.

10:42:47       Q.    I'm trying to go with your

10:42:53    understanding.  I asked you if anybody else was

10:42:55    involved in marketing.  You said you had a sense

10:42:58    of what that word was but you wanted a further

10:43:02    clarification and I asked your combination and you

10:43:06    said promoting products.  I want to go with that.

10:43:09    Is there anybody else at National Nonwovens who is

10:43:12    involved with promotion of the products?

10:43:14       A.    Yes.

24

10:43:14      Q.   Who else?

10:43:15      A.   Our sales people, our research and

10:43:17   development people.

10:43:18      Q.   You have a sales staff and a research

10:43:22   and development staff?

10:43:23      A.   Correct.

10:43:25      Q.   Who is on your sales staff?

10:43:29      A.   Could you be specific in what you're

10:43:44   asking?

10:43:46      Q.   Do you have people that are involved in

10:43:48   sales?

10:43:48      A.   Yes.

10:43:49      Q.   Who are those people that are involved

10:43:51   in sales?

10:43:52      A.   Our technical sales representatives.

10:44:00      Q.   And who else?

10:44:02      A.   And our manufacturing sales

10:44:05   representatives.

10:44:06      Q.   Anybody else on the sales -- involved in

10:44:14   sales?

10:44:14      A.   No.

10:44:15      Q.   How many technical sales representatives

10:44:21   do you have?

10:44:22      A.   Three.

25

10:44:30     Q.   How many manufacturing sales

10:44:34     representatives do you have?

10:44:35     A.   Three.

10:44:38     Q.   What are the responsibilities of the

10:44:42     technical sales representatives?

10:44:44     A.   To sell National Nonwovens' products.

10:44:49     Q.   The technical sales representatives

10:44:57     contact clients for purposes of selling products?

10:45:02     A.   Yes.

10:45:02     Q.   Or arranging sales?

10:45:04     A.   Yes.

10:45:04     Q.   Are the technical sales representatives

10:45:20     physically located in Massachusetts -- when I say

10:45:23     physically located, are their residences in

10:45:27     Massachusetts?

10:45:27     A.   No.

10:45:27     Q.   You have technical sales representatives

10:45:30     in different areas of the country?

10:45:32     A.   Yes.

10:45:32     Q.   Could you just tell me where each of the

10:45:37     three technical sales representatives is located?

10:45:39     A.   Ohio, Texas, Maryland.

10:45:52     Q.   Do each of the technical sales

10:45:56     representatives have a geographically defined area

26

10:46:02   of responsibility?

10:46:07      A.   No.

10:46:12      Q.   Do they have distinct areas of

10:46:21   responsibility?

10:46:23      A.   Yes.

10:46:23      Q.   How are their areas of responsibility

10:46:23   defined relative to each other?

10:46:27            MR. DIONNE:  I'm going to have to

10:46:28   object here.  You're getting very close to our

10:46:31   trade secrets and we think that's proprietary

10:46:36   information.  We do not have a protective order in

10:46:39   this case.  I'm instructing her not to answer any

10:46:41   further.

10:46:41            MR. DUDA:  Let's see which questions

10:46:43   you're not going to answer.  I asked you how their

10:46:49   responsibilities are defined relative to each

10:46:51   other and you're instructing your witness not to

10:46:54   answer on that.

10:46:55            MR. DIONNE:  Exactly.

10:46:56      Q.   (BY MR. DUDA) Which of the sales

10:46:58   representatives has responsibility for the

10:47:00   southeastern United States?

10:47:03      A.   None.

10:47:07      Q.   None?  So none of them has

PERLIK and COYLE REPORTING

27

10:47:10    responsibility for -- well, let's try it.  Do any

10:47:16    of the representatives have responsibility for the

10:47:20    northeast enUnited States?

10:47:21        A.    No.

10:47:21        Q.    So they don't have any responsibilities

10:47:24    that are defined geographically?

10:47:26        A.    Correct.

10:47:27        Q.    But your counsel is going to instruct

10:47:30    you not to tell me how their responsibilities are

10:47:33    defined, is that right?

10:47:34            MR. DIONNE:  In the lack of a

10:47:36    protective order; yes.

10:47:43        Q.    (BY MR. DUDA)  What are their names?

10:47:46            MR. DIONNE:  One minute.

10:47:49            (Pause in proceedings.)

10:47:49            MR. DIONNE:  Okay. , go ahead.

10:47:50        Q.    (BY MR. DUDA)  What are their names?

10:47:52        A.    A.m. A N D A butt L E R.

10:47:58        Q.    L A U R I E W R I G H T, and Joseph K E

10:48:11    L S C H?

10:48:14        Q.    Could you tell me where each one of them

10:48:17    is located -- Amanda Butler?

10:48:20        A.    Maryland.

10:48:21        Q.    And Laurie right?

PERLIK and COYLE REPORTING

28

10:48:24     A.   Texas.

10:48:24     Q.   And Joseph K?

10:48:26     A.   Ohio.

10:48:27     Q.   What are the responsibilities of
10:48:41   manufacturing representatives?

10:48:42     A.   To sell our product.

10:48:43     Q.   Are the responsibilities of the
10:48:50   manufacturing representatives distinct from the
10:48:54   responsibilities of the technical sales
10:48:56   representatives?

10:48:57     A.   Please explain.

10:48:58     Q.   Do the manufacturing sales
10:48:59   representatives as a group have responsibilities
10:49:01   that are different from the technical sales
10:49:04   representatives?

10:49:04     A.   No.

10:49:04     Q.   What's the reason for the difference in
10:49:10   names?

10:49:13     A.   Manufacturer sales reps are not our
10:49:17   direct employees.

10:49:18     Q.   How many manufacturing sales
10:49:22   representatives do you have?

10:49:23     A.   Three.

10:49:25     Q.   Where are they located?

PERLIK and COYLE REPORTING

29

10:49:35      A.   New York, New York, Virginia.

10:49:39      Q.   Just to complete that, why don't you

10:49:54   give me the names of the manufacturing sales reps?

10:49:57            MR. DIONNE:  I object to that.  That

10:49:58   is also a trade secret.

10:50:01            MR. DUDA:  So you're instructing her

10:50:02   not to answer that.

10:50:03            MR. DIONNE:  Instructing her not to

10:50:05   answer, in the absence of a protective order.

10:50:21            MR. DUDA:  Let's mark this as

10:50:25   Exhibit 2.

                        (Defendant's Deposition Exhibit
                         No. X offered and marked.)
10:50:50

10:50:53      Q.   (BY MR. DUDA)  Just before we go on to

10:50:56   Exhibit 2, other than the technical sales

10:50:59   representatives, the manufacturing sales

10:51:01   representatives, your marketing coordinator, your

10:51:04   marketing assistant and yourself, is anybody else

10:51:07   involved in sales of product for National

10:51:09   Nonwovens?

10:51:09      A.   Please define what you mean by sales?

10:51:19      Q.   Is anybody else involved in contacting

10:51:22   customers?

10:51:22      A.   Yes.

PERLIK and COYLE REPORTING

30

10:51:23     Q.   Who else is involved in contacting

10:51:24   customers?

10:51:25     A.   Customer service.

10:51:27     Q.   How many people in customer service?

10:51:31     A.   Four.

10:51:34     Q.   Are the individuals involved in customer

10:51:47   service involved in developing marketing

10:51:49   materials?

10:51:49     A.   No.

10:51:49     Q.   Are they involved in distributing

10:51:52   marketing materials?

10:51:53     A.   Yes.

10:51:53     Q.   Are they involved in originating sales

10:52:10   with customers?

10:52:11     A.   I can't answer that for sure.

10:52:25     Q.   You don't know?

10:52:27     A.   No; I don't know.

10:52:30     Q.   Is anybody in customer service involved

10:52:40   in designing advertising?

10:52:41     A.   No.

10:52:41     Q.   We've marked as Exhibit 2 a document

10:52:51   that's a Massachusetts corporation annual report.

10:52:54   It's from the Secretary of State's Office.  Item

10:53:05   number seven there indicates people who are

PERLIK and COYLE REPORTING

10:53:09   president, treasurer secretary, treasurer and

10:53:12   clerk of National Nonwovens, Inc.   Is that

10:53:15   information accurate?

10:53:16        A.   Yes.

10:53:16        Q.   Is there no other director than

10:53:22   Mr. Centofanti?

10:53:23        A.   Correct STPHAOEUFPLT get the offices of

10:53:29   all above STPHAOEUFPLT so you are the clerk of the

10:53:31   corporation.

10:53:31        A.   Correct.

10:53:32        Q.   How long has National Nonwovens, Inc.

10:54:06   been in existence?

10:54:07        A.   National Nonwovens, Inc. being?

10:54:10        Q.   I think it's the corporation identified

10:54:14   on this report.  Is that the corporation you work

10:54:18   for?

10:54:18        A.   Yes.

10:54:19        Q.   How long has that corporation been in

10:54:22   existence under the name National Nonwovens, Inc.?

10:54:34                 THE WITNESS:  1995.

10:54:37        Q.   What was its predecessor name?

10:54:40        A.   National Felt.

10:54:41        Q.   Do you know how long the corporation was

10:54:53   in existence under the name National Felt?

32

10:54:56     A.   No.

10:54:57     Q.   When you started working for the current

10:55:03   employer, was the corporation then named National

10:55:06   Felt?

10:55:06     A.   Yes.

10:55:07     Q.   Was it headquartered in Easthampton?

10:55:11     A.   Yes.

10:55:12     Q.   Massachusetts?

10:55:12     A.   Yes.

10:55:12     Q.   Does the corporation have an office in

10:55:26   Boston, also?

10:55:26     A.   No.

10:55:26     Q.   Does it have an office anywhere other

10:55:28   than Easthampton, Massachusetts?

10:55:28     A.   Office being defined as?

10:55:30     Q.   A place where employees work.

10:55:36     A.   Our satisfies men work out of their

10:55:39   houses.

10:55:40     Q.   Other than the houses in which your

10:55:43   sales people work out of, does your company have

10:55:47   another office?

10:55:48     A.   No.

10:55:48     Q.   Does National Nonwovens, Inc. have any

10:55:57   subsidiary corporations?

10:55:59    A.    No.

10:55:59    Q.    Does National Nonwovens, Inc.

10:56:06    manufacture any product?

10:56:07    A.    Yes.

10:56:08    Q.    Where does it manufacture the product?

10:56:12    A.    Easthampton, Massachusetts.

10:56:13    Q.    What products does it manufacture?

10:56:17    A.    Products?  Please define.

10:56:25    Q.    What types of products?

10:56:26    A.    Are you -- please explain specifically.

10:56:37    Q.    You don't know what I mean by types of

10:56:39    products?

10:56:40    A.    No.

10:56:40    Q.    Due know what I mean by products?

10:56:42    A.    No.

10:56:42    Q.    Does it manufacture anything?

10:56:46    A.    Yes.

10:56:46    Q.    What does it manufacture?

10:56:47    A.    Nonwoven wool goods.

10:56:58    Q.    You gave me a list of products earlier?

10:57:01    A.    I gave you a list of technologies.

10:57:04    Q.    Spun bond, melt blown, needle punch, air

10:57:14    laid, chemical bond, thermal bond and wool felt or

10:57:22    felted wool?

34

10:57:23     A.   Felted wool.

10:57:24     Q.   Are all technologies?

10:57:25     A.   Correct.

10:57:26     Q.   They are not products?

10:57:27     A.   Those are technologies.

10:57:29     Q.   They are not products?

10:57:32     A.   No.

10:57:32     Q.   You would not describe any product that

10:57:35 you manufacture by any of those names?

10:57:41     A.   We would describe a product by a style

10:57:45 name or a trade name.

10:57:46     Q.   Could you give me an example ever a

10:57:50 style name by which you would describe a product?

10:57:52     A.   FIL 006.

10:57:59     Q.   What does FIL 006 correlate to?

10:58:03     A.   A filtration product.

10:58:08     Q.   A filtration product?

10:58:10     A.   Yes.

10:58:10     Q.   What's a filtration product?

10:58:13     A.   A product that would filter something.

10:58:15     Q.   So you make a product that filters

10:58:17 something?

10:58:18     A.   Correct.

10:58:18     Q.   What is that made up of, that product

35

10:58:23   that filters something -- FI -- what was the

10:58:26   number you used, FI what?

10:58:29        A.   FIL 006.

10:58:32        Q.   What is that made out of?

10:58:34        A.   It's made out of fiber.

10:58:41        Q.   What kind of fiber?

10:58:43        A.   Now we're getting into.

10:58:47             MR. DIONNE:  It's all right.

10:58:48             THE WITNESS:  It's made out of

10:58:49   polyester.

10:58:52        Q.   (BY MR. DUDA)  So you have at least one

10:58:55   type of product that's made out of polyester?

10:58:58        A.   Yes.

10:58:58        Q.   Do you have products that's made out of

10:59:02   anything other than polyester?

10:59:05        A.   Yes.

10:59:05        Q.   What else?

10:59:05        A.   Do you want specific product names or do

10:59:18   you want owe owe?  You said that this particular

10:59:20   product was made out of polyester.

10:59:23        A.   Correct.

10:59:23        Q.   I would like to know that other -- what

10:59:27   products are made out of other materials or what

10:59:29   other materials are going into your products,

PERLIK and COYLE REPORTING

36

10:59:33    other than polyester?

10:59:39        A.    You're asking what other types of fiber

10:59:43    go into products?

10:59:45        Q.    Sure.

10:59:45        A.    N O M E X, wool, rayon, nylon, kevlar.

11:00:06        Q.    Did you say nomex?

11:00:08        A.    Yes.

11:00:08        Q.    Is that a -- is nomex a trade name or a

11:00:18    generic product?

11:00:20        A.    I don't know.

11:00:20        Q.    But you just know that as nomex?

11:00:24        A.    Correct.

11:00:24        Q.    And it's a type of fiber material?

11:00:27        A.    Correct.

11:00:27        Q.    The polyester, nomex, wool, rayon, nylon

11:00:32    and kevlar are all fiber materials?

11:00:35        A.    Correct.

11:00:47        Q.    You manufacture in Easthampton products

11:00:50    that are made out of polyester, nomex, rayon,

11:00:56    nylon and kevlar?

11:00:58        A.    Yes; there may be more.

11:01:00        Q.    Those are the ones that you recall right

11:01:02    now?

11:01:02        A.    Correct.

37

11:01:04      Q.    Do you sell any materials that you don't

11:01:06   manufacture?

11:01:07      A.    I can't honestly answer that.  I don't

11:01:21   know.

11:01:21      Q.    You don't know?

11:01:22      A.    No.

11:01:22      Q.    So far as you know, you don't buy and

11:01:28   resell any products without first manufacturing?

11:01:34      A.    I can't honestly.

11:01:36      Q.    You don't know?

11:01:37      A.    I don't know.

11:01:37      Q.    Does National Nonwovens make wool felt?

11:02:03      A.    We manufacture felted wool.

11:02:05      Q.    You don't make wool felt?

11:02:06      A.    We manufacture felted wool.

11:02:07      Q.    My question is do you make wool felt?

11:02:10      A.    No.

11:02:10      Q.    You don't make wool felt?

11:02:12      A.    No.

11:02:12      Q.    Do you market wool felt?

11:02:15      A.    We have a product trade marked WOOLFELT,

11:02:21   one word.

11:02:22      Q.    But you don't market wool felt as two

11:02:26   words?

11:02:27      A.   No.

11:02:27      Q.   Have you ever marketed wool felt?

11:02:41      A.   One word or two?

11:02:45      Q.   Two words?

11:02:46      A.   I don't recall.

11:02:50      Q.   You don't recall whether you've ever

11:02:54   marketed wool felt?

11:02:55      A.   No.

11:02:55      Q.   Do you know whether or not you market or

11:03:04   use the words wool felt in any marketing material

11:03:08   right now as two words?

11:03:09      A.   Not for certain.

11:03:21      Q.   You don't know?

11:03:22      A.   I don't know.

11:03:23      Q.   When I use the term wool felt, do you

11:03:40   know what I'm talking about?

11:03:41      A.   No.

11:03:42      Q.   Do you know how the term -- do you have

11:03:46   any understanding how the term wool felt as two

11:03:51   words is being used by other companies?

11:03:51      A.   No.

11:03:58      Q.   You don't?  The term wool felt as two

11:04:06   words has no meaning to you?

11:04:08      A.   It has meaning.

PERLIK and COYLE REPORTING

39

11:04:10      Q.   What is that meaning?

11:04:13      A.   As two words?

11:04:16      Q.   Yes.

11:04:16      A.   The incorrect usage of felted wool.

11:04:35      Q.   The incorrect -- what do you mean by

11:04:40   incorrect usage of felted wool?

11:04:42      A.   Felted wool is a process, a technology.

11:04:50   It is how you manufacture the product.  It has

11:04:52   been used incorrectly by using the word wool felt.

11:04:58      Q.   Do you know of any product that's

11:05:02   identified correctly by the term wool felt as two

11:05:05   words?

11:05:06      A.   No.

11:05:09      Q.   It would be your opinion or at least

11:05:14   your understanding that any party that uses the

11:05:17   term wool felt to identify product is using that

11:05:21   term incorrectly?

11:05:21      A.   Yes.

11:05:22      Q.   Do you have any understanding of how

11:05:31   long the term wool felt has been used, correctly

11:05:36   or incorrectly?

11:05:36             MR. DIONNE:  Objection; it

11:05:38   presupposes that she has knowledge of that.

11:05:40      Q.   (BY MR. DUDA) I was asking do you have

PERLIK and COYLE REPORTING

40

11:05:43   any understanding of how long the term wool felt

11:05:45   has been used to identify product, whether

11:05:48   correctly or incorrectly?

11:05:49       A.   No.

11:05:50       Q.   So far as you know when National

11:06:12   Nonwovens has ever used the term wool felt to

11:06:14   identify product, it has done so incorrectly?

11:06:17       A.   As two words?

11:06:18       Q.   Yes.

11:06:18       A.   Incorrectly.

11:06:19       Q.   Just to make sure the answer is clear.

11:06:24   So far as you know, your understanding then, if

11:06:27   National Nonwovens has ever used the term wool

11:06:29   felt as two words to identify product, it has done

11:06:32   so incorrectly?

11:06:33       A.   Correct.

11:06:33       Q.   The term felted wool, does this identify

11:06:46   a product?

11:06:48       A.   A process.

11:06:49       Q.   A process?

11:06:51       A.   Yes.

11:06:51       Q.   Could you explain what that process is?

11:06:56       A.   Felting wool.  I can't give you the

11:07:20   specific.  I'm not a technician to give you the

PERLIK and COYLE REPORTING

41

11:07:24    specific process.

11:07:24        Q.   Whatever your understanding is, that's

11:07:27    fine.  I don't expect you to guess.

11:07:31        A.   Taking fiber, wool fiber, and felting it

11:07:35    by applying pressure, heat, moisture to create a

11:07:39    material.

11:07:39        Q.   Does the product that results from that

11:07:44    process have a name?

11:07:46        A.   It is a felted wool.  It's whatever

11:07:55    company would identify it, basically it's a

11:07:58    nonwoven fabric.

11:08:03        Q.   But does the product that results from

11:08:04    the felted wool process that you just described,

11:08:07    does that product have a name by which it's

11:08:11    identified?

11:08:13             MR. DIONNE:  Are you talking trade

11:08:15    name?

11:08:16             MR. DUDA:  No.

11:08:18        Q.   (BY MR. DUDA)  A name for that type of

11:08:20    product, does it have a name other than a trade

11:08:22    name?

11:08:22        A.   Felted wool.

11:08:23        Q.   So felted wool is both a product and a

11:08:26    process?

PERLIK and COYLE REPORTING

42

11:08:29      A.   It can be; yes.

11:08:30      Q.   If I refer to felted wool, that means

11:08:36  something to you?

11:08:36      A.   Yes.

11:08:37      Q.   If one is to refer to the product that

11:08:44  results from the felted wool process as felted

11:08:50  wool, that would be correct, in your opinion?

11:09:00      A.   The fabric that is formed from the

11:09:29  felted wool process is a nonwoven fabric and it

11:09:38  can be whatever a company names it after that, but

11:09:44  it is a nonwoven fabric.

11:09:46      Q.   How would you distinguish that nonwoven

11:09:51  fabric from fabric made from some other

11:09:56  material -- from a nonwoven fabric from some other

11:10:00  material?

11:10:00      A.   By whatever name a company would

11:10:02  designate it.

11:10:03      Q.   You're saying that the name for the

11:10:05  product that results from the felted wool process

11:10:07  can only have a manufacturer's name?

11:10:09      A.   It's a nonwoven fabric.

11:10:13      Q.   How do you distinguish that nonwoven

11:10:18  fabric, the one that results from the felted wool

11:10:21  process, from any other nonwoven product?

43

11:10:24     A.   By whatever trademark or trade name or

11:10:28     company name.

11:10:30     Q.   Do I understand you correctly, then,

11:10:33     that you're saying that the only way you can

11:10:36     distinguish the product that results from the

11:10:38     felted wool process from other nonwoven products

11:10:43     is by trade names?

11:10:45     A.   No.

11:10:47     Q.   How else do you distinguish it?

11:10:49     A.   By whatever name a company would

11:10:58     designate to the product.  I'm not following the

11:11:05     question.

11:11:07     Q.   If a party that's not a company, a

11:11:16     hypothetical individual in a laboratory, maybe at

11:11:19     the University of Massachusetts goes through the

11:11:22     nonwoven -- goes through the felted wool process

11:11:25     to produce a product, what would that product be

11:11:28     called?  Does it have a generally accepted name to

11:11:32     identify that type of product that result from the

11:11:35     felted wool process, other than a company's trade

11:11:38     name or what a particular company identifies that

11:11:42     product as?

11:11:45     A.   It would be designated a nonwoven fabric

11:11:48     or a nonwoven material.

PERLIK and COYLE REPORTING

44

11:11:51      Q.   And you could not use the word wool in

11:11:53   association with that nonwoven material?

11:11:58      A.   You could say it is a felted wool,

11:12:02   describing the process just as you would say a

11:12:05   material is needle punched, using the needle punch

11:12:15   process.

11:12:15      Q.   If I weave a product out of cotton, I

11:12:20   may call the resulting product a cotton product?

11:12:27      A.   That, I don't know.

11:12:29      Q.   If you make a shirt out of cotton and

11:12:31   the product would be called a cotton shirt, would

11:12:35   you agree with that?

11:12:36      A.   I'm not understanding what you're

11:12:46   asking.  You're asking about what you would

11:12:48   identify the product as or what the product is.

11:12:50      Q.   How you would identify the product?

11:12:53      A.   Based on the industry -- nonwoven

11:12:56   industry says that it's a nonwoven fabric.

11:13:01      Q.   Let's go back again.  If there is a

11:13:04   product that's manufactured from the felted wool

11:13:07   process, do you have a names for that product

11:13:11   other than what a particular manufacturer may

11:13:15   identify that particular product as?

11:13:17               MR. DIONNE:  This has been asked and

PERLIK and COYLE REPORTING

11:13:19    answered about sixteen times now.

11:13:21              MR. DUDA:  It hasn't been answered

11:13:23    yet.

11:13:23              MR. DIONNE:  Yes; it has.  You just

11:13:25    don't want to accept the answer she's put in.

11:13:29              MR. DUDA:  What is the answer.

11:13:30              MR. DIONNE:  I'm not going to

11:13:32    testify here.  I'm not going to let you sit here

11:13:35    and play word games and harass her.

11:13:38              MR. DUDA:  I want to get on the

11:13:40    record that she doesn't want to call it felted

11:13:44    wool.

11:13:44              MR. DIONNE:  She called it felted

11:13:46    wool.  You want her to call it something else.

11:13:48              MR. DUDA:  Felted wool is fine.  If

11:13:51    there is a product that a made from the felted

11:13:54    wool process, what is that product called other

11:13:57    than or more specifically than a nonwoven product.

11:14:01    Is there any other name more specific than a

11:14:03    nonwoven product.

11:14:06              THE WITNESS:  I can be specific as

11:14:08    to if we designed a felted wool material in the

11:14:11    lab, we would designate that a felted wool

11:14:18    material that is a nonwoven fabric and then it

PERLIK and COYLE REPORTING

46

11:14:22   would be given a lab number.

11:14:26      Q.   But you certainly would not call it a

11:14:29   wool felt?

11:14:31      A.   No.

11:14:32      Q.   What should we refer to the product that

11:14:40   nonwoven makes from the felted wool process?

11:14:43      A.   Repeat the question?

11:14:46      Q.   For purposes of today, what should we

11:14:50   refer to -- what name should we use to refer to

11:14:53   the product that National Nonwovens makes through

11:14:57   the felted wool process?

11:14:59      A.   Felted wool.

11:15:01      Q.   Felted wool?

11:15:01      A.   Yes.

11:15:02      Q.   So far as you know, does any other

11:15:07   company make a product that is correctly

11:15:11   identified as felted wool?

11:15:12      A.   Manufacturers?

11:15:17      Q.   Yes.

11:15:18      A.   I don't know.

11:15:19      Q.   You don't know the name of any other

11:15:21   manufacturer?

11:15:21      A.   No.

11:15:22      Q.   Let's try some definitions for going

PERLIK and COYLE REPORTING

47

11:15:32    forward.  I think, I hope it's been clear up to

11:15:36    now and correct me if I'm wrong, when I've been

11:15:39    saying you, what you make, I'm referring to you or

11:15:42    any individual at National Nonwovens or the

11:15:44    company, itself, because you're here as a 30(b)(6)

11:15:48    deponent.  If I use the term you, what does do you

11:15:53    do, I'm referring to National Nonwovens or the

11:15:57    company, unless I otherwise indicating that I'm

11:16:00    talking about you specifically as an individual,

11:16:02    is that clear?

11:16:03        A.   Yes.

11:16:03        Q.   As we've been going so far, when I use

11:16:11    the term wool felt, and wool felt as two words

11:16:17    without any capitalization.  If I mean WOOLFELT as

11:16:23    one word, I will say WOOLFELT as one word without

11:16:27    any capitalization, is that clear?

11:16:30        A.   Yes.

11:16:30        Q.   If I say WOOL FELT mark, the spelling

11:16:35    will be capital W O O L, capital F E L T, the WOOL

11:16:42    FELT mark, is that clear?

11:16:43        A.   Correct.

11:16:44        Q.   And finally we talk about the wool felt

11:16:47    trademark registration, that's going to refer to

11:16:50    registration number 2073811 of the United States

48

11:17:01   patent and trademark office?

11:17:03                MR. DIONNE:  Will this be a good

11:17:06   time to have a break?

11:17:07                MR. DUDA:  Let me finish this

11:17:10   question.

11:17:10                MR. DUDA:  With a registration date

11:17:12   of June 24th, 1997.  Let's mark this as Exhibit 3

11:17:28   and then we can take a break.

                         (Defendant's Deposition Exhibit
                           No. X offered and marked.)
11:17:49

11:17:50      Q.   (BY MR. DUDA)  What we've marked as

11:17:51   Exhibit 3, it's a two page document that's from

11:18:12   the United States patent and trademark office --

11:18:16   I'm sorry, a three-page document from the United

11:18:19   States patent and trademark office.  In fact why

11:18:23   don't we mark those pages consecutively one, two,

11:18:27   three.

11:18:38                MR. DUDA:  Want to take a break?

11:41:32                (A recess was taken.)

11:41:32      Q.   (BY MR. DUDA)  I'd like to mark this

11:41:48   document as the next exhibit.

                         (Plaintiff's Deposition Exhibit
                           No. X offered and marked.)
11:42:15

11:42:15                MR. DUDA:  I'm also, for purposes of

PERLIK and COYLE REPORTING

11:42:17    this exhibit, going to just consecutively mark the

11:42:24    pages.  It's an eleven-page document, the first

11:42:42    page of which has the heading for this case,

11:42:45    National Nonwovens, Inc. versus Consumer Products

11:42:48    Enterprises, Inc.  This consists of three

11:42:51    documents, the second set of interrogatories to

11:42:56    defendant and then beginning to page five of this

11:42:58    exhibit is the Plaintiff's second request for

11:43:01    production of documents.  Beginning to page

11:43:17    eight -- I'm sorry, beginning on page nine is

11:43:20    notice of deposition.

11:43:24        Q.   (BY MR. DUDA)  Ms. Centofanti, I don't

11:43:30    know if you've ever seen this document or any of

11:43:34    these documents before? (Indicating.)

11:43:36        A.   (Witness examining document.)  Not all.

11:43:43        Q.   I'd like to just refer to a couple of

11:43:47    entries on here.  On page three of the document,

11:43:52    under interrogatories, number one asks -- this is

11:43:57    asking Consumer Products Enterprises, Inc. to

11:43:59    identify all employees of Hancock fabrics of

11:44:03    Tupelo Mississippi with whom defendant or any

11:44:08    employee of defendant has communicated with during

11:44:11    the period of January 1, 2002 to date.  Then, if

11:44:21    you turn to page seven of this document, under

PERLIK and COYLE REPORTING

50

11:44:24    documents requested, it asks for all documents

11:44:28    received from and/or sent to Hancock fabrics of

11:44:31    Tupelo Mississippi during the period of January 1,

11:44:36    2002 to date.  Then if we go to page ten of this

11:44:43    document, which is the second page of the notice

11:44:48    of deposition, it refers to National Nonwovens'

11:44:53    business relationship with Hancock fabrics of

11:44:56    Tupelo, Mississippi.  In light of that, I would

11:45:09    ask you why National Nonwovens is interested in

11:45:21    the relationship between Consumer Products

11:45:28    Enterprises and Hancock fabrics in Tupelo,

11:45:32    Mississippi?

11:45:33                    MR. DIONNE:  If you know.

11:45:34                    THE WITNESS:  This is the first I've

11:45:35    seen of this.  I don't know.

11:45:37        Q.    (BY MR. DUDA)  Does Nonwovens do any

11:45:42    business with Hancock fabrics of Tupelo,

11:45:45    Mississippi?

11:45:46        A.    That would be a customer list, if I

11:45:56    answer the question and we don't have.

11:46:00                    MR. DIONNE:  You can answer that, if

11:46:01    you know.

11:46:02                    THE WITNESS:  Currently?

11:46:04        Q.    (BY MR. DUDA)  Yes.

51

11:46:05     A.   No.

11:46:07     Q.   Has it, in the past?

11:46:12     A.   Yes.

11:46:16     Q.   Do you have an understanding whether CPE

11:46:22 does any business with a company called Hancock

11:46:26 fabrics in Tupelo, Mississippi?

11:46:30     A.   Yes.

11:46:30     Q.   What is that understanding?

11:46:31     A.   They sell product to Hancock fabrics.

11:46:35     Q.   What is the basis of that understanding?

11:46:38 How have you arrived at that conclusion?

11:46:41     A.   Their product is present in their

11:46:49 stores.

11:46:50     Q.   In Hancock fabrics' stores?

11:46:54     A.   Right.

11:46:55     Q.   Hancock fabric has retail stores?

11:46:58     A.   Correct.

11:46:58     Q.   Is that the sole basis for your

11:47:00 understanding that CPE sells product to Hancock

11:47:03 fabrics?

11:47:03     A.   Yes.

11:47:04     Q.   How long ago did nonwovens stop doing

11:47:16 business with Hancock fabrics?

11:47:18     A.   I don't recall.

52

11:47:19      Q.   Has nonwovens ever done business with

11:47:24   Hancock fabrics since you've been involved with

11:47:30   nonwovens?

11:47:31      A.   Yes.

11:47:31      Q.   Did nonwovens stop doing business with

11:47:36   Hancock fabrics more than a year ago?

11:47:38      A.   Yes.

11:47:38      Q.   More than two years ago?

11:47:41      A.   Yes.

11:47:52      Q.   Do you have an understanding why Hancock

11:47:56   fabrics stopped doing business with National

11:47:59   Nonwovens?

11:47:59      A.   No.

11:47:59      Q.   Have you ever contacted anyone at

11:48:01   Hancock fabrics -- you, personally?

11:48:05      A.   Yes.

11:48:05      Q.   What was the reason for that contact?

11:48:08      A.   To establish a dialogue to have them

11:48:14   purchase product from National Nonwovens.

11:48:16      Q.   Did they?

11:48:19      A.   No.

11:48:20      Q.   Did you ever talk with anyone at ha cock

11:48:31   fabrics about CPE -- or Consumer Products

11:48:37   Enterprises?

11:48:37      A.   Yes.

11:48:37      Q.   Who was that -- who at Hancock fabrics

11:48:41  did you speak to about Consumer Products

11:48:44  Enterprises?

11:48:44      A.   C A R L  Z A N D E R and B R A D B E R G.

11:48:59      Q.   Why did you talk to Carl Zander and Brad

11:49:04  Berg about CPE?

11:49:07      A.   CPE sells acrylic materials to Hancock

11:49:24  fabric they now purchase their acrylic fabric from

11:49:35  CPE.  We wanted to second source or replace CPE on

11:49:40  acrylic fabric.

11:49:50      Q.   Do you understand that you are in

11:49:52  competition with CPE for Hancock fabrics'

11:49:57  business?

11:49:57      A.   Yes.

11:50:04      Q.   Do you have an understanding whether CPE

11:50:08  sells wool felt or felted wool on Hancock fabrics?

11:50:12      A.   Yes.

11:50:14      Q.   What is that understanding?

11:50:16      A.   That CPE is selling a wool rayon blended

11:50:36  material to Hancock fabrics.

11:50:36      Q.   Have you ever spoken with anybody at

11:50:47  Hancock fabrics about replacing CPE with that

11:50:53  source of material that you just described?

54

11:50:54       A.   No.

11:50:55       Q.   Has anyone at Hancock fabrics suggested

11:51:03   to you that he or she was confused by CPE's use of

11:51:08   the term wool felt, two words?

11:51:11       A.   No.

11:51:11       Q.   Has anyone else suggested to you that

11:51:16   someone at Hancock fabrics is confused by CPE's

11:51:21   use of the term wool felt?

11:51:22       A.   No.

11:51:30       Q.   Do you know of any other evidence that

11:51:32   anyone at Hancock Fabrics is confused by CPE's use

11:51:37   of the term wool felt?

11:51:38       A.   No.

11:51:40       Q.   Do you know of any evidence that anyone

11:51:46   at Hancock Fabrics was confused by CPE's use of

11:51:54   any trade or copyright that nonwovens owns?

11:52:20       A.   No.

11:52:21       Q.   Do you have any evidence that CPE used

11:52:24   the wool felt mark in connection with any product

11:52:28   that it sold to Hancock Fabrics, W O O L, capital

11:52:38   F E L T STPHAOEUFPLT WOOL FELT STPHAOEUFPLT?

11:52:42       A.   What do you mean by evidence.

11:52:43       Q.   Well, let's take it one at a time.  Do

11:52:46   you know of any documents which suggest that CPE

11:52:51    used the WOOL FELT mark in connection with any

11:52:55    commercial product that it sold or marketed to

11:52:57    Hancock Fabrics?

11:52:59        A.    Yes; I have seen labeling by CPE top --

11:53:11    in Hancock stores that say wool felt.

11:53:18        Q.    As one word?

11:53:19        A.    I don't recall if it was one word or

11:53:21    two.

11:53:21        Q.    Let me try the question again because

11:53:23    maybe it wasn't clear.  I was asking whether you

11:53:26    know of any -- we'll take them one at a time.

11:53:29    Whether you know of any documents that suggest or

11:53:32    show that CPE used the WOOL FELT mark -- due know

11:53:38    what I mine by the Wool Felt mark?

11:53:41        A.    No.

11:53:41        Q.    Again going forward, when I use the term

11:53:46    WOOL FELT mark, I'm going to mean capital W O O L,

11:53:52    capital F E L T, okay.  That's the WOOL FELT mark.

11:53:59    So when I refer to the WOOL FELT mark I mean wool

11:54:03    felt spelled that way?

11:54:04        A.    As one word?

11:54:06        Q.    Yes.  Now I'll try one more time.  Do

11:54:09    you know of any documents which show or suggest

11:54:12    that CPE used the WOOL FELT mark in connection

PERLIK and COYLE REPORTING

56

11:54:15    with any product that it marketed to Hancock

11:54:19    Fabrics?

11:54:19         A.   Suggest, yes.

11:54:30         Q.   Have you produced those documents to us

11:54:35    so far as you know?

11:54:36                   MR. DIONNE:  Yes.

11:54:37                   THE WITNESS:  Yes.

11:54:37                   MR. DUDA:  We'll have to maybe ask

11:54:42    for a little better clarify indication of the

11:54:46    document production request.  You gave me a group

11:54:50    of documents.  I don't know which ones are

11:54:52    responsive to that question.

11:54:54                   MR. DIONNE:  That was my error.  We

11:54:57    talked, I got them out fast and they didn't put

11:55:00    them in numbered like I should have.  I apologize

11:55:03    for that.  Unlike what you did for me.  I'd be

11:55:10    happy to let you know which ones are which.

11:55:14                   MR. DUDA:  Maybe if we have time --

11:55:16    well, you probably want to sit down and look at

11:55:18    them.  You've bat stamped them.

11:55:20                   MR. DIONNE:  I can give you what

11:55:22    numbers on the Bate stamps are in response to what

11:55:24    questions.

11:55:24                   MR. DUDA:  I guess we need some sort

PERLIK and COYLE REPORTING

57

11:55:26    of a record, maybe a letter, a brief letter,

11:55:29    number one, Bate stamps number -- something like

11:55:32    that.

11:55:32                 MR. DIONNE:  Yes; no problem.

11:55:40         Q.   (BY MR. DUDA)  In response to that last

11:55:45    question, you -- I understood you to distinguish

11:55:49    the use of the word suggest.  It was a compound

11:55:54    question in that respect so I'll try to narrow it

11:55:58    down even further, then.  Do you know of any

11:56:01    documents that show CPE using the WOOL FELT mark

11:56:05    in connection with the sale of any product to

11:56:09    Hancock Fabrics?

11:56:09         A.   Not to my knowledge.

11:56:12         Q.   Do you know of any other evidence -- and

11:56:28    we had trouble with evidence before.  Other than

11:56:31    documents, do you know of anything else -- I'll

11:56:40    leave it broadly for now -- that shows CPE using

11:56:44    the WOOL FELT mark in connection with its

11:56:49    marketing or sale of products to Hancock Fabrics?

11:56:56                 MR. DIONNE:  May I -- I think

11:56:58    documents is confusing her.  A document -- this is

11:57:03    a document but a label is a document and I think

11:57:06    that's where she's having a problem.

11:57:08                 MR. DUDA:  Okay.


                    PERLIK and COYLE REPORTING

58

11:57:15                THE WITNESS:  Advertising.

11:57:16                MR. DIONNE:  Is that a document?

11:57:18        Q.   (BY MR. DUDA)  Do you know of any

11:57:19    physical object that shows the use by CPE of the

11:57:26    WOOL FELT mark in connection with the marketing or

11:57:28    sale of any commercial product?

11:57:31        A.   Object being?

11:57:39        Q.   Any object -- any physical object?

11:57:42        A.   Being a label?

11:57:43        Q.   Sure.

11:57:44        A.   It suggests using the mark.

11:57:52        Q.   From your earlier question, you made a

11:57:57    distinction between suck and shows.  I understand

11:57:59    your response now with respect to suggests.  Now

11:58:02    I'm saying shows or I hope I said shows -- any

11:58:06    document that shows the use by CPE of the Wool

11:58:11    Felt mark in connection with the marketing or sale

11:58:13    of any product?

11:58:13        A.   Not to my knowledge.

11:58:15        Q.   Do you know of any physical object that

11:58:32    shows the use by CPE of any trademark or copyright

11:58:40    that National Nonwovens owns?

11:58:43        A.   Copyright?

11:58:45        Q.   Yes.

59

11:58:45        A.    Yes.

11:58:46        Q.    What is that copyright?  Is it one item

11:58:51    or more than one item when you refer to copyright?

11:58:55        A.    It would be more than one item.

11:58:59        Q.    Could you describe to me what are those

11:59:01    items that you believe --

11:59:04        A.    Did you produce those as well.

11:59:06              MR. DIONNE:  Yes; we have.

11:59:07        Q.    (BY MR. DUDA)  If you could just tell me

11:59:11    your understanding of those copyrighted items?

11:59:13        A.    One would be the boiled wool

11:59:16    instructions.

11:59:22        Q.    Anything else?

11:59:22        A.    The use of our sheep.

11:59:31        Q.    A sheep design?

11:59:33        A.    A sheep design.

11:59:34        Q.    In which nonwovens has a copyright?

11:59:39        A.    Correct.

11:59:40        Q.    Anything else?

11:59:40        A.

11:59:48              MR. DIONNE:  Would you like to look

11:59:49    at the complaint.

11:59:50              THE WITNESS:  Yes.

11:59:51              MR. DIONNE:  Have her look at the

PERLIK and COYLE REPORTING

60

11:59:53   complaint and she can tell you with a's there.

11:59:54              MR. DUDA:  I can look at the

11:59:56   complaint.  I'm just asking for her own knowledge

12:00:00   right now.

12:00:00              MR. DIONNE:  If you don't remember

12:00:02   totally, then you don't remember.

12:00:03              THE WITNESS:  I don't remember.

12:00:04       Q.   (BY MR. DUDA)  As you sit here what you

12:00:06   recall are boiled wool instructions and a sheep

12:00:09   design?

12:00:09       A.   Yes.

12:00:10       Q.   As you sit here, you can't think of any

12:00:12   item that she she has a copyright in -- I'm sorry,

12:00:16   that National Nonwovens has a copyright in that

12:00:19   CPE has used?

12:00:20       A.   I don't remember.

12:00:20       Q.   Is there any trademark -- well, let me

12:00:30   step back again.  Do you know of any physical

12:00:32   object that shows the use by CPE of any trademark

12:00:40   that National Nonwovens owns?

12:00:43       A.   Repeat that question, please?

12:00:47       Q.   Do you know of any physical object that

12:00:49   shows the use by CPE of any trademark that

12:00:53   National Nonwovens owns?

PERLIK and COYLE REPORTING

12:00:54        A.    No.

12:00:57        Q.    Has anyone at Hancock Fabrics stated to
12:01:22    you that he or she was confused by the use of any
12:01:30    trademark or copyright by CPE?

12:01:32        A.    No.

12:01:35        Q.    Do you know of any occasion in which you
12:01:56    personally or anyone at nonwovens communicated
12:02:02    with Hancock Fabrics in understanding that CPE was
12:02:07    violating a trademark or copyright of National
12:02:11    Nonwovens?

12:02:11        A.    My attorney accept a letter to Hancock.

12:02:20        Q.    Other than your attorney, did anyone at
12:02:23    National Nonwovens ever communicate with anyone at
12:02:29    Hancock Fabrics the assertion or suggestion that
12:02:38    CPE was violating a trademark or copyright of
12:02:42    National Nonwovens?

12:02:42        A.    No.

12:02:43        Q.    You never had any telephone conversation
12:02:45    with anybody at Hancock Fabrics in which the
12:02:49    trademark or copyright of CPE was discussed?

12:02:52        A.    No.

12:02:53        Q.    Or the trademark or copyright use by CPE
12:02:57    was discussed?

12:02:58        A.    No.

62

12:02:58      Q.   And you know of anyone at nonwovens who

12:03:04   has had such a discussion, other than perhaps your

12:03:07   attorney?

12:03:07      A.   Not to my knowledge.

12:03:08      Q.   But your understanding is your attorney

12:03:10   sent a letter to Hancock Fabrics regarding the use

12:03:14   by CPE of a trademark or copyright that National

12:03:18   Nonwovens claims?

12:03:18      A.   Yes.

12:03:19      Q.   Do you know of any other party that was

12:03:23   contacted by your attorney or anyone else

12:03:28   regarding an allegation that CPE was using a

12:03:31   trademark or copyright of National Nonwovens?

12:03:33      A.   That our attorney had contacted?

12:03:37      Q.   Yes.

12:03:38      A.   No.

12:03:38      Q.   So Hancock Fabrics would be the only

12:03:40   party that your attorneys contacted to that

12:03:42   effect?

12:03:42      A.   I believe so.

12:03:44      Q.   Has anyone at nonwovens ever had any

12:03:56   communication with anyone at CPE regarding

12:03:59   possible purchase of nonwovens by CPE?

12:04:02      A.   Repeat that question.

PERLIK and COYLE REPORTING

63

12:04:04      Q.   Has anyone at nonwovens ever had a

12:04:08   conversation or a communication with anyone at CPE

12:04:12   regarding the possibility of CPE purchasing

12:04:16   nonwovens?

12:04:17      A.   Yes.

12:04:17      Q.   Do you recall approximately when that

12:04:21   conversation occurred?

12:04:21      A.   I don't recall.

12:04:23      Q.   Do you recall who at nonwovens had that

12:04:27   conversation?

12:04:27      A.   Yes.

12:04:30      Q.   Who was that?

12:04:31      A.   The president of National Nonwovens.

12:04:34      Q.   Who is?

12:04:35      A.   Anthony Centofanti.

12:04:36      Q.   Do you know with whom Mr. Centofanti had

12:04:41   that conversation?

12:04:42      A.   Was the president of CPE.

12:04:47      Q.   Do you know where that occurred?

12:04:50      A.   I don't know.

12:04:56      Q.   Do you know whether it occurred in

12:04:59   Massachusetts?

12:04:59      A.   I don't know.

12:05:01      Q.   Did Mr. Centofanti talk to you about

PERLIK and COYLE REPORTING

64

12:05:11    that conversation?

12:05:11        A.    Yes.

12:05:14        Q.    What did Mr. Centofanti tell you about

12:05:17    that conversation?

12:05:18        A.    The president of CPE mentioned the

12:05:28    possibility of promoting our product line into

12:05:33    distribution channels we could not reach and they

12:05:36    should have further discussions about it.

12:05:37            MR. DIONNE:  Just a general

12:05:54    objection, it's all hearsay, but I'll let her

12:05:57    answer.

12:05:57        Q.    (BY MR. DUDA)  Do you know whether

12:06:12    anybody else was present during that conversation

12:06:16    besides Mr. Centofanti and the president of CPE?

12:06:19        A.    I don't know.

12:06:19        Q.    My understanding from the complaint that

12:06:48    was filed in this litigation is that National

12:06:56    Nonwovens claims rights in the trademark WOOLFELT,

12:07:07    is that your understanding?

12:07:07        A.    Yes.

12:07:11        Q.    Is it also your understanding that that

12:07:16    National Nonwovens claims rights -- trademark

12:07:19    rights in the word or term wool felt, small W O O

12:07:25    L, small F E L T as one word?

65

12:07:28     A.   Not to my knowledge.

12:07:33     Q.   Is it your understanding that National

12:07:42   Nonwovens claims trademark rights in the term,

12:07:46   word or symbol capital W O O L, small f e l t as

12:07:54   one word?

12:07:54     A.   No.

12:07:54     Q.   Than I am correct to say that National

12:08:00   Nonwovens is not claiming trademark rights in wool

12:08:04   felt as two words?

12:08:06     A.   Correct.

12:08:06     Q.   Whether the W or the F is capitalized?

12:08:12         MR. DIONNE:  I'm going to object

12:08:14   here.  You're asking for a legal conclusion as to

12:08:17   whether or not rights under their trademarks are

12:08:21   limited to exactly what you see.  I would point

12:08:24   out in Exhibit Number 3, that the particular mark

12:08:33   is in shown there in capital letters.  If one

12:08:37   looks up the trademark law and looks up the TMEP,

12:08:43   trademark manual examining procedure that is the

12:08:47   broadest form it can be in.  For her to understand

12:08:49   whether or not small caps, large caps, small

12:08:52   letters, large letters ends up as a trademark or

12:08:55   under this trademark is a legal question and I

12:08:58   don't think she's qualified to answer that.


                     PERLIK and COYLE REPORTING

66

12:09:00            MR. DUDA:  She is here as a

12:09:01    representative of the company.  That company sued

12:09:03    my client.  I would hope that.

12:09:05            MR. DIONNE:  I though that.

12:09:06            MR. DUDA:  I would hope that the

12:09:08    representative of the company knowing what they

12:09:11    are suing for.

12:09:12            MR. DIONNE:  She is relying on

12:09:14    advice of counsel.

12:09:15            MR. DUDA:  I have to ask.

12:09:17            MR. DIONNE:  You can ask all you

12:09:20    want but it's a legal conclusion.

12:09:22            MR. DUDA:  If you're suggesting that

12:09:23    the litigation is being driven by a lawyer's

12:09:26    understanding and not the client's understanding.

12:09:27            MR. DIONNE:  I'm not suggesting

12:09:29    anything.  You can take it any way you wish.  We

12:09:31    have filed a lawsuit under the terms our client

12:09:34    asked us to.  We did that.

12:09:35            MR. DUDA:  That's what I'm trying to

12:09:37    understand.

12:09:37            MR. DIONNE:  I'm sure you are.

12:09:39        Q.   (BY MR. DUDA)  With the hopes of trying

12:09:41    to understand and I genuinely am trying to

PERLIK and COYLE REPORTING

12:09:44    understand what is the scope of this lawsuit and

12:09:47    what it is your claiming, what your understanding

12:09:49    is -- the company's understanding, not your

12:09:51    lawyer's understanding, my question, then, was

12:09:55    whether or not National Nonwovens is claiming

12:09:59    trademark rights in the term wool felt as two

12:10:03    words, whether or not the W or the F of those

12:10:07    words are capitalized?

12:10:08        A.   I can't legally understand.  I can tell

12:10:22    you what we have registration for which WoolFelt

12:10:27    is one word W. o o l capital F E L T.

12:10:37        Q.   I'm asking in your understanding whether

12:10:40    or not you're claiming that your trademark rights

12:10:42    extend to the term wool felt used as two words,

12:10:46    whether or not the W or the F is capitalized?

12:10:50        A.   I'm not legally qualified to answer

12:11:02    unless it causes confusion with our WoolFelt -- W

12:11:11    O O L one word capital F E L T.  If it causes, the

12:11:19    two words, causing confusion with our trademark,

12:11:21    there is concern.

12:11:22        Q.   Your understanding then is that National

12:11:29    Nonwovens is claiming right in the use of the

12:11:33    word -- or the term wool felt, whether or not

12:11:38    capitalized to the extent that it causes confusion

68

12:11:46   with your WoolFelt mark -- that is wool felt as

12:11:51   one word with a capital W and a capital F, right?

12:11:56       A.   Right.

12:11:57       Q.   And you are not claiming trademark

12:12:00   rights with two words wool felt whether

12:12:03   capitalized or not if it does not cause confusion

12:12:06   with your WOOLFELT mark, is that right?

12:12:15       A.   Right STPHAOEUFPLT above your WOOL FELT

12:12:24   should be be WOOLFELT be sure to check all the way

12:12:30   through above STPHAOEUFPLT.

12:12:35           MR. DUDA:  Let's mark this as

12:12:40   Exhibit 5.

                       (Defendant's Deposition Exhibit
                        No. X offered and marked.)
12:13:21

12:13:21       Q.   (BY MR. DUDA)  We've marked as Exhibit 5

12:13:23   a collection of documents that I believe have all

12:13:31   been taken off the Internet as indicated by the

12:13:34   bottom of each page.  If you could take a look

12:13:40   through this and let me know if any of these

12:13:48   companies have been contacted by anyone on behalf

12:13:52   of National Nonwovens to inform that company that

12:14:00   the company is violating a trademark right of

12:14:03   National Nonwovens?

12:14:06       A.   (Witness examining documents.)  No.


                     PERLIK and COYLE REPORTING

69

12:16:11    Q.   (BY MR. DUDA)  Looking at that, in your

12:16:14    opinion, does the use -- does any one of those

12:16:17    documents reflect a violation of National

12:16:20    Nonwovens trademark rights?

12:16:21    A.   Yes.

12:16:22    Q.   Could you identify which ones?

12:16:26    A.   Apple creek designs S T E G M A N

12:16:51    STPHAOEUFPLT get it from documents STPHAOEUFPLT

12:16:52    keep safe quilting, B E R G O N stock beach, Anny

12:17:01    keep sakes, Mary's garden STPHAOEUFPLT get all of

12:17:07    this STPHAOEUFPLT K R O W N shop, plum pudding, C

12:17:36    R A W Ford designs.

12:17:38    Q.   So far as you know, no one at National

12:17:41    Nonwovens or on behalf of National Nonwovens has

12:17:43    contacted any of those companies with respect to

12:17:47    potential trademark infringement, correct?

12:17:50    A.   Correct.

12:18:05         MR. DUDA:  Let's mark this as

12:18:06    Exhibit 6.

                        (Defendant's Deposition Exhibit
                         No. X offered and marked.)
12:18:32

12:18:36    Q.   (BY MR. DUDA)  Looking at Exhibit 6,

12:18:39    which shows a heading National Nonwovens,

12:18:42    innovative textiles solutions since 1905.  This


                    PERLIK and COYLE REPORTING

12:18:47   appears to be something off your web page -- off

12:18:51   National Nonwovens' web page, correct?

12:18:55        A.   Correct.

12:18:55        Q.   Is this a web page that was designed by

12:18:57   you or somebody in your staff?

12:19:00        A.   Yes.

12:19:00        Q.   Do you know when, approximately, this

12:19:02   web page was designed?

12:19:04        A.   Approximately '99.  I can't be sure.

12:19:13        Q.   Would you have approved or did you

12:19:16   approve this page before it went onto the Website?

12:19:21        A.   I don't recall.

12:19:22        Q.   But this was prepared by your staff?

12:19:24        A.   Correct.

12:19:30             MR. DUDA:  We can mark this one as

12:19:33   Exhibit 7.

                         (Defendant's Deposition Exhibit
                            No. X offered and marked.)
12:19:56

12:20:05        Q.   (BY MR. DUDA)  Exhibit 7 is seven pages,

12:20:08   I believe which are all pages that we received in

12:20:13   response to our document production request that

12:20:17   was propounded by CPE to National Nonwovens.  I

12:20:22   would just like to show you these or this exhibit

12:20:25   and ask perhaps we could just go through each page

PERLIK and COYLE REPORTING

12:20:28   and you could, to the extent possible, identify

12:20:32   where these are from because we just received the

12:20:36   pages.  For the most part, I don't know where they

12:20:40   are.  The first one does seem to be from a

12:20:42   magazine called sew business, is that correct?

12:20:48        A.   I don't know.  This was private my

12:20:50   arrival there.  I don't recognize the name.

12:20:52        Q.   Have you heard of a magazine called sew

12:20:55   business?

12:20:56        A.   No.

12:20:56        Q.   Is there somebody at National Nonwovens

12:21:00   that would be able to tell us where this came from

12:21:06   and why you have this on file -- that would have

12:21:09   some knowledge about this?

12:21:10        A.   Not to my knowledge.

12:21:11        Q.   There's nobody on your staff that worked

12:21:14   there since 1985?

12:21:15        A.   No.

12:21:15        Q.   Do you know how -- I don't want any

12:21:19   privileged communication, but I'm just trying to

12:21:22   figure out where this came from.  How this got

12:21:24   from your office to us.  Is this found somewhere

12:21:26   in your office, this document?

12:21:29        A.   There was files.

72

12:21:31     Q.   Are there files of old advertising, is

12:21:34   that it?

12:21:34     A.   Correct.

12:21:34     Q.   You think it's likely that if we needed

12:21:40   to get the original of this, you could probably

12:21:42   find this in your office somewhere?

12:21:44     A.   I don't know if we have the original.

12:21:46     Q.   Or a copy?

12:21:47     A.   Correct.

12:21:47     Q.   Do you know what Commonwealth felt

12:21:54   company was or is?

12:21:55     A.   Yes.

12:21:58     Q.   Well, let me ask whether was or is is

12:22:04   proper.  Is Commonwealth Felt Company still exist?

12:22:08     A.   No.

12:22:08     Q.   What was Commonwealth Felt Company?

12:22:11     A.   It was the converting division of

12:22:13   National Felt.

12:22:15     Q.   Did you say converting division?

12:22:17     A.   Correct.

12:22:18     Q.   What is a converting division?

12:22:22     A.   When you take wool goods, do something

12:22:24   to them and convert them to another product.

12:22:27     Q.   Is that part of the manufacturing

PERLIK and COYLE REPORTING

12:22:29    process?

12:22:29        A.   It can be.  It could be as simple as

12:22:32    slitting or cutting rectangles of material.  It

12:22:37    could be applying pressure sensitive material to

12:22:44    something.

12:22:44        Q.   So any reforming or any alteration or

12:22:51    modification of the wool product fits into that

12:22:54    category and fits into what Commonwealth felt

12:22:57    company did?

12:22:58        A.   Of any nonwoven product.

12:23:00        Q.   All right; I understand.  Was this a

12:23:08    subsidiary then of National Felt?

12:23:11        A.   Not to my knowledge.

12:23:12        Q.   Was it -- was it a separate corporation?

12:23:18        A.   No.

12:23:18        Q.   What was its relation to National Felt?

12:23:22        A.   It was -- I don't know specifically.

12:23:33        Q.   Can you just give me the best you can.

12:23:35    You said it's not a separate corporation, it's not

12:23:38    a subsidiary.  What's your best understanding what

12:23:41    it was, then?

12:23:42        A.   It was a company name that they operated

12:23:44    a division under.

12:23:45        Q.   I see.  It could have been a division

PERLIK and COYLE REPORTING

74

12:23:48    within National Felt?

12:23:49        A.    Right.

12:23:50        Q.    So far as you know, Commonwealth Felt

12:23:53    Company didn't have a separate corporation?

12:23:56        A.    Not to my knowledge.

12:23:57        Q.    Do you know when Commonwealth felt

12:24:03    company -- or approximately when Commonwealth felt

12:24:06    company went out of existence?

12:24:07        A.    No; I don't.

12:24:09        Q.    Do you know whether it was more than ten

12:24:11    years ago -- maybe this would be easier.  Do you

12:24:17    know whether that happened before or after you

12:24:19    arrived at National Felt?

12:24:24        A.    I don't recall.

12:24:24        Q.    Who at National Nonwovens would have

12:24:36    that kind of historical knowledge?  Would your

12:24:40    husband -- who at National Nonwovens is likely to

12:24:43    have that type of historical knowledge?

12:24:45        A.    The president.

12:24:46        Q.    If we just go to page two of this.  Do

12:24:55    you know where this document comes from -- or this

12:25:01    page comes from?

12:25:02        A.    It comes from a trade magazine.  I don't

12:25:09    know which trade magazine.

75

12:25:11      Q.   Looking at it, can you give me an

12:25:14   approximate date?

12:25:17      A.   No; I can't give you approximate date.

12:25:26   I can give you an approximate month based on the

12:25:26   show but not a date.

12:25:26      Q.   What's the approximate month?

12:25:26      A.   It would be a July, release of a year.

12:25:35      Q.   Is this an annual show?

12:25:36      A.   Yes.

12:25:36      Q.   Is this an annual show that still

12:25:39   occurs?

12:25:39      A.   I don't know.  That organization merged

12:25:41   with another organization so I don't know.

12:25:43      Q.   What is this organize?

12:25:44      A.   It was ACCI -- American craft and I

12:25:50   don't remember what the nomenclature stood for.

12:25:54   The show was held every year in July in rose M O N

12:26:02   T, Illinois.

12:26:08      Q.   Was there a show last July?

12:26:10      A.   I don't know.

12:26:10      Q.   Obviously you didn't show at the show?

12:26:12      A.   Correct.

12:26:14      Q.   What about the year before?

12:26:16      A.   No; we did not attend.

76

12:26:17       Q.   What about page three?  Just before we

12:26:27    go on, I'm just a little confused.  Do you know --

12:26:33    there's two numbers, I guess it's on each of these

12:26:39    pages.  I just noticed that.  Do you know, for

12:26:45    example, just going back to page one, on the

12:26:47    bottom there's 010093 and then there N 00095.  I

12:26:55    don't know if that's our stamp?

12:27:00                MR. DIONNE:  It's not our number.

12:27:01                MR. DUDA:  Is the N your stamp.

12:27:04                MR. DIONNE:  No; I have no idea what

12:27:05    that is.

12:27:06                MR. DUDA:  Then it's probably ours.

12:27:09    The 00186 is your number.

12:27:15                MR. DIONNE:  That's our number.

12:27:16       Q.   (BY MR. DUDA)  Turn to page three,

12:27:18    identified by 000 STPHAOEUFPLT get the number from

12:27:22    document STPHAOEUFPLT.  Do you know where that

12:27:25    page comes from?

12:27:25       A.   This comes from a directory of some

12:27:40    sort.  I don't know which directory.

12:27:42       Q.   When did the company start using

12:27:45    National Nonwovens rather than National Felt as

12:27:50    its name?

12:27:50       A.   1995.


                    PERLIK and COYLE REPORTING

77

12:27:51      Q.   Is that still your address, post office

12:28:08   box 150?

12:28:08      A.   Yes.

12:28:09      Q.    Is that still your Website address?

12:28:14      A.   Yes.

12:28:14      Q.   When did you first have a Website

12:28:17   address?

12:28:19      A.   I don't recall exactly when.

12:28:22      Q.   That would be within the last five

12:28:25   years?

12:28:25      A.   I don't know.

12:28:31      Q.   We could probably go by just looking at

12:28:37   the network solutions or something like that?

12:28:39      A.   Correct.

12:28:54            MR. DIONNE:  Those marks must be

12:28:57   yours, the N's.

12:28:59            MR. DUDA:  I think that must have

12:29:02   been our paralegal that stamped those.

12:29:15      Q.   (BY MR. DUDA)  Turning to page four, do

12:29:21   you know what that document is?

12:29:22      A.   Yes.

12:29:23      Q.   What is that?

12:29:24      A.   A color card.

12:29:26      Q.   A color card?

PERLIK and COYLE REPORTING

78

12:29:28      A.   Yes.

12:29:28      Q.   What's a color card?

12:29:31      A.   It's a piece of literature that's given

12:29:36   that would show samples of color shades.

12:29:38      Q.   This is you say a piece of literature.

12:29:43   It's marketing literature that you would share

12:29:45   with a customer or a potential customer?

12:29:48      A.   Correct.

12:29:48      Q.   Do you know the approximate date of this

12:29:50   document?

12:29:50      A.   No.

12:29:50      Q.   Is there any way that you could find

12:29:53   that out?

12:29:53      A.   I don't know.

12:29:57      Q.   Do you still use this dock in your

12:30:01   marketing?

12:30:01      A.   No -- this particular one, no.

12:30:04      Q.   No?

12:30:07      A.   No.

12:30:07      Q.   Next page, page five, do you know where

12:30:18   that's from?

12:30:18      A.   That's the back of a color card.

12:30:20      Q.   It's likely that four and five -- page

12:30:29   four and five of Exhibit 7 are the front and back

PERLIK and COYLE REPORTING

79

12:30:33   of a color card?

12:30:34       A.   Four would be the front, five would be

12:30:36   the back.

12:30:37       Q.   Looking at page six, this has May, 1996

12:31:04   date shown on it and it refers to Craft Trends of

12:31:08   Sew Business.  So far as you know, Craft Trends,

12:31:13   is that a section of the sew business magazine?

12:31:18       A.   Craft Trends is the magazine.

12:31:20       Q.   It's the name of the magazine?

12:31:21       A.   Correct.

12:31:22       Q.   Does Craft Trends still exist?

12:31:24       A.   Yes.

12:31:25       Q.   It does?

12:31:25       A.   Yes.

12:31:26       Q.   Do you sell advertising on Craft Trends?

12:31:29       A.   No.

12:31:29       Q.   Do you have any idea what page seven is?

12:31:54   What's that for?

12:31:55       A.   I didn't participate in making this.  I

12:32:04   don't know what this is.

12:32:33            MR. DUDA:  Let's mark this as

12:32:35   Exhibit 8.

                      (Defendant's Deposition Exhibit
                       No. X offered and marked.)
12:32:54


                   PERLIK and COYLE REPORTING

12:32:55      Q.    (BY MR. DUDA) Ms. Centofanti, we've

12:32:57      marked as Exhibit 8 a document that I believe is a

12:33:05      copy of a document from the United States patent

12:33:08      and trademark office.  It is a declaration under

12:33:10      37 C F R 2.41.

12:33:26              MR. DIONNE:  This document has been

12:33:29      modified.  There's a print 2 F claim bracketing

12:33:34      the number 4 number.  I know what 2 F is.  I just

12:33:41      wonder how it got on this document.  We didn't

12:33:46      give you that with that document.

12:33:51              MR. DUDA:  It's not my writing.  I'm

12:33:56      certainly not holding anyone to it but thank you

12:33:59      for pointing it out.

12:34:00              MR. DIONNE:  No problem.  Just

12:34:08      pointing it out.

12:34:08      Q.    (BY MR. DUDA) Except for that right as

12:34:17      Mr. Dionne rightly pointed out which is not part

12:34:17      of the original document obviously from the United

12:34:20      States trade and patent officer, this appears to

12:34:22      be a declaration of 37 C.F.R. 2.41 which is signed

12:34:27      by Anthony Centofanti and it shows a date of

12:34:31      11/15/1996.  Mr. Centofanti is your husband?

12:34:41      A.    Correct.

12:34:41      Q.    Looking at par graph four of this

PERLIK and COYLE REPORTING

12:34:52    document, just the typewritten aspect of that,

12:34:56    that paragraph says since that time, referring to

12:34:59    early September, 1991 -- it says since that time,

12:35:02    the mark WOOLFELT has been used in connection with

12:35:08    fabric STPHAOEUFPLT substantially exclusively and

12:35:11    continuously in interstate commerce by applicant

12:35:15    for five years before the date on which this claim

12:35:18    STPHAOEUFPLT whatever is made STPHAOEUFPLT get all

12:35:19    of this from document STPHAOEUFPLT I'm asking your

12:35:23    understanding of that as an officer of the

12:35:27    corporation.  Is it your understanding that that

12:35:29    claim is with respect solely to the registered

12:35:35    trademark WOOLFELT and not to WOOL FELT as two

12:35:43    words?

12:35:43        A.   Correct.

12:35:56            MR. DUDA:  Let's mark this as.

12:36:06            MR. DIONNE:  We're going on towards

12:36:08    one o'clock.  Do you want to break?

12:36:12            MR. DUDA:  I guess we should.  We'll

12:36:14    leave it up to you.  If you want to take a break

12:36:17    and we probably should.  Why don't we take a quick

12:36:55    break now and then we'll go another half hour.

12:38:00            (A recess was taken.)

12:39:06            MR. DUDA:  Let's mark this as

12:39:15    Exhibit 9.

                          (Defendant's Deposition Exhibit
                            No. X offered and marked.)
12:39:34

12:39:36        Q.    (BY MR. DUDA)   We've marked as Exhibit 9

12:39:38    a document which the title declaration under

12:39:41    section 8 of the trademark 8 and the mark is

12:39:47    WOOLFELT there is nothing like the real thing and

12:39:51    design.  On page two of this exhibit which is

12:39:56    Bate-stamped 0100 STPHAOEUFPLT get it from

12:39:59    document STPHAOEUFPLT there's an individual who

12:40:03    appears to have signed this document named Peter K

12:40:06    U R Z I N A.  Do you know who that is?

12:40:13        A.    Yes.

12:40:13        Q.    Who is Peter K?

12:40:15        A.    He was part of a workout group hired by

12:40:19    the previous owners.

12:40:22        Q.    Did the previous owners have the company

12:40:27    in bankruptcy?

12:40:28        A.    No.

12:40:28        Q.    When you say a workout group, what was

12:40:32    the situation of the workout?

12:40:34        A.    The company was financially in trouble.

12:40:37        Q.    And this was something that the company

12:40:41    did informally, on its own, so far as you know?

83

12:40:47               MR. DIONNE:  If you know.

12:40:48               THE WITNESS:  I don't know.

12:40:51               MR. DIONNE:  Don't guess.

12:40:52               MR. DUDA:  But Mr. K as far as you

12:40:55    understand it, was part of that workout group.

12:40:58       A.   Yes.

12:40:58       Q.   This is -- is this before or after your

12:41:07    husband went to work for the company?

12:41:09       A.   Before.

12:41:10       Q.   Does your husband own this company now?

12:41:26       A.   Yes.

12:41:31       Q.   When did he purchase the company?

12:41:32       A.   I don't know the exact date.

12:41:34       Q.   Do you know whether it was before or

12:41:38    after the National Nonwovens was formed as -- or

12:41:45    at least that name, National Nonwovens was taken

12:41:47    on by the company?

12:41:47       A.   Before.

12:41:48       Q.   Before that, he purchased it?

12:41:50       A.   Yes.

12:41:50       Q.   Was his purchase in connection with this

12:41:56    workout at all?

12:41:57       A.   No.

12:41:58       Q.   Has the company ever been in bankruptcy,

PERLIK and COYLE REPORTING

84

12:42:05    so far as you know?

12:42:06        A.    Not to my knowledge.

12:42:24            MR. DUDA:  Let's mark this as the

12:42:59    next exhibit.

                    (Defendant's Deposition Exhibit
                        No. X offered and marked.)
12:43:21

12:43:21        Q.    (BY MR. DUDA) We've now marked as

12:43:24    Exhibit 10 a document entitled plaintiff's

12:43:26    response to the Defendant's first set of

12:43:28    interrogatories; which is signed by your counsel.

12:43:35    Have you ever seen this document before?

12:43:37    (Indicating.)

12:43:39        A.    No.

12:43:39        Q.    You participated in the preparation of

12:43:48    the responses to this document -- I'm sorry.  Let

12:43:52    me try that again.  You participated in the

12:43:55    preparation of the responses that are contained in

12:43:57    this document?

12:43:58        A.    Yes.

12:43:58        Q.    Did you -- why don't you take a moment

12:44:08    and look at this document and just see if you've

12:44:11    actually seen the responses before today?

12:44:16        A.    (Witness examining document.)

12:46:44        Q.    Have you ever seen these responses

85

12:46:47   before?

12:46:47      A.   Yes.

12:46:49      Q.   Looking at interrogatory number three,

12:47:01   which is on page two of Exhibit 10, the question

12:47:07   asks to identify all persons involved in

12:47:12   discussions concerning whether to register or

12:47:15   concerning the registration of the market WOOLFELT

12:47:19   in the United States patent and trademark office.

12:47:22   It says information not known.  Is there no one at

12:47:29   National Nonwovens who knows about the

12:47:35   registration of that trademark?

12:47:37      A.   Correct.

12:47:38             MR. DIONNE:  Which registration.

12:47:39             MR. DUDA:  The mark WOOLFELT.

12:47:42             MR. DIONNE:  There is two marks

12:47:44   WOOLFELT.

12:47:55      Q.   (BY MR. DUDA) Before we talk about

12:47:58   Exhibit 3, were there any discussions about the

12:48:01   trademark WOOLFELT.  Do you know of anybody at the

12:48:06   company who was involved in any discussion

12:48:10   concerning the registration of any mark with

12:48:10   WOOLFELT in it?

12:48:10      A.   The original?

12:48:10      Q.   WOOLFELT.  I'm trying to -- I'm just

86

12:48:13  reading this the way it was apparently interpreted

12:48:17  by whoever answered the question information not

12:48:20  no one so apparently no information was known

12:48:22  about a WOOLFELT trademark or is this complied in

12:48:29  here it was assumed that it meant the first mark

12:48:31  and not the second mark?  Is that what we're

12:48:35  seeing in here?

12:48:35            MR. DIONNE:  Can I tell you.

12:48:36            MR. DUDA:  I don't know.  It's your

12:48:38  answer.

12:48:38            MR. DIONNE:  It's your question and

12:48:40  the question is not clear so the answer is not

12:48:42  clear.

12:48:42            MR. DUDA:  It says information not

12:48:44  known.

12:48:45     Q.   (BY MR. DUDA) My question is:  Is there

12:48:47  anybody at National Nonwovens that you can

12:48:49  identify who was involved in discussions

12:48:50  concerning registering any trademark with the term

12:48:55  WOOLFELT in it as shown in that interrogatory?

12:48:58     A.   The original WOOLFELT there is known

12:49:02  there.

12:49:02     Q.   The original mark using the word

12:49:04  WOOLFELT as shown there.  Do you know of anybody

87

12:49:08  at National Nonwovens involved in any discussion

12:49:10  concerning the registration of a trademark using

12:49:12  that word or that term WOOLFELT as shown in that

12:49:16  interrogatory?

12:49:16      A.   Yes.

12:49:16      Q.   Who is involved in those discussions?

12:49:23      A.   Anthony Centofanti and myself.

12:49:27      Q.   Nobody else at National Nonwovens was

12:49:30  involved in discussions concerning registration of

12:49:33  a WOOLFELT trademark?

12:49:34      A.   No.

12:49:35      Q.   Nobody else in your sales department?

12:49:37      A.   No.

12:49:38      Q.   STPHAOEUFPLT be sure you have the right

12:49:41  spelling so check the exhibit STPHAOEUFPLT?

12:49:49          MR. DIONNE:  I've got to put a

12:49:51  clarify indication on the record here.  The

12:49:54  WOOLFELT trademark as I read interrogatory number

12:49:58  four -- or number three, is a part of the first

12:50:02  registration and a part of the second

12:50:04  registration.  WOOLFELT when they adopted that

12:50:08  word, whether it be in the first or second

12:50:11  registration, those discussions were held, if

12:50:16  there were any, were held back before

PERLIK and COYLE REPORTING

12:50:19    Mrs. Centofanti or Mr. Centofanti were part of the

12:50:22    company.  This was interpreted, I believe, to be

12:50:29    that that's the time that WOOLFELT, whether it be

12:50:33    in the design form or whether it be in the word

12:50:36    form, was talked about.  Had the interrogatory

12:50:43    been more specific as to how WOOLFELT is used in

12:50:47    each registration, the answer obviously would have

12:50:50    been different.

12:50:54        Q.   (BY MR. DUDA)  With whom were those

12:50:57    discussions held concerning registration of the

12:51:01    WOOLFELT mark -- the discussions you just talked

12:51:06    about in your last answer?

12:51:12        A.   Between my husband and myself.

12:51:12        Q.   Just between the two of you?

12:51:12        A.   Yes.

12:51:12        Q.   I assume you had discussions with

12:51:13    somebody else other than just the two of you?

12:51:17        A.   No.

12:51:17        Q.   Did you use counsel to register the

12:51:20    trademark?

12:51:20        A.   Yes.

12:51:20        Q.   I assume you had discussions with your

12:51:24    counsel about registering the trademark?

12:51:26        A.   Yes.

12:51:26      Q.   Other than discussions between you and

12:51:28   your husband and discussions with your counsel,

12:51:31   you know of no other discussions concerning

12:51:33   whether to register or registering a mark with

12:51:38   WOOLFELT in it?

12:51:39      A.   Correct.

12:51:39      Q.   Before registration of design mark

12:52:01   indicated by Exhibit 3?

12:52:03              MR. DIONNE:  WOOLFELT design mark?

12:52:06              MR. DUDA:  Or just WOOLFELT.  I

12:52:08   think it's called WOOLFELT and design.  In any

12:52:11   event, W O O L F E L T as one word.

12:52:14              MR. DIONNE:  There's no design

12:52:15   there.

12:52:18      Q.   (BY MR. DUDA) With the WOOLFELT mark,

12:52:27   did you do any research before making the decision

12:52:31   to register that mark owe and let me clarify that

12:52:36   and restate the question.  Before making a

12:52:38   decision to register the WOOLFELT mark that's

12:52:41   shown in Exhibit 3, did you too any research as to

12:52:46   prior use of the term WOOLFELT as one word by

12:52:51   other parties prior to your registration?

12:52:55      A.   No.

12:52:55      Q.   Did you receive an opinion letter or any

PERLIK and COYLE REPORTING

90

12:53:12    written document from your counsel regarding the

12:53:18    registration of the mark or whether the mark could

12:53:23    be validly registered with the United States

12:53:26    patent and trademark office?

12:53:27              MR. DIONNE:  I'm going to object to

12:53:29    that.  It's attorney-client privilege.  She can

12:53:31    answer as to whether she's received

12:53:35    communications, what the communications related

12:53:37    to, validity, infringement, whatever, that's

12:53:41    attorney-client privilege and I'm instructing her

12:53:43    not to answer.

12:53:43              MR. DUDA:  You're instructing her

12:53:45    not to answer whether or not she received an

12:53:47    opinion as to the registerability of this mark.

12:53:50              MR. DIONNE:  That's correct.

12:53:51              MR. DUDA:  Do you believe that's a

12:53:53    proper instruction.

12:53:54              MR. DIONNE:  If I said it, it's

12:53:56    proper.

12:53:56              MR. DUDA:  You're going to put forth

12:53:59    any mention that you did counsel her as to the

12:54:01    registerability as to this mark.

12:54:04              MR. DUDA:  Mr. Dionne.

12:54:06              MR. DIONNE:  Mr. Duda.

PERLIK and COYLE REPORTING

12:54:08                    MR. DUDA:  Mr. Dionne.

12:54:10                    MR. DIONNE:  I'm not here to explain

12:54:13     my objections to you.  We will bring them to

12:54:18     trial.

12:54:19                    MR. DUDA:  We have to bring it to

12:54:20     court.

12:54:20                    MR. DIONNE:  Bring it to court.

12:54:22                    MR. DUDA:  We have a requirement to

12:54:25     discuss this before we go to court with it.  I'm

12:54:28     concerned about the fact you're instructing the

12:54:28     witness not to answer not to the substance of the

12:54:30     advice but whether the advice was rendered.

12:54:33                    MR. DIONNE:  When you asked the

12:54:34     question as to whether or not I talked about that

12:54:37     letter or a communication to my client as to

12:54:41     registerability you're asking for the substance of

12:54:43     my comments.

12:54:44                    MR. DUDA:  No; I'm not.

12:54:45                    MR. DIONNE:  That's what I'm getting

12:54:47     to.

12:54:47                    MR. DUDA:  I'm asking as to the

12:54:48     topic.  In trademark or patent cases certainly the

12:54:51     opinion letter of an attorney, whether or not such

12:54:55     one was issued is relevant.  You certainly have a

PERLIK and COYLE REPORTING

12:54:58    right to withhold it but it has certain

12:55:00    implications.

12:55:01              MR. DIONNE:  If you want to call

12:55:03    that an opinion, the answer is did she get an

12:55:06    opinion letter from me, she can answer that but

12:55:09    I'm not going to characterize that opinion by

12:55:11    either registerability opinion, validity opinion

12:55:16    or.

12:55:17              MR. DUDA:  How is she going to

12:55:18    answer the question unless I know what the opinion

12:55:20    was about.

12:55:21              MR. DIONNE:  You asked her.  We're

12:55:23    talking about registration.

12:55:24              MR. DUDA:  You told her not to

12:55:25    answer the question.

12:55:33              MR. DIONNE:  Ask the question again.

12:55:35              MR. DUDA:  I will try to ask the

12:55:36    question however Mr. Dionne feels comfortable

12:55:40    with.  I would like an answer without infringing

12:55:43    on any attorney-client communication, whether or

12:55:46    not you received an opinion letter, if you

12:55:47    understand what that means, concerning the

12:55:49    registerability if you understand what that means.

12:55:52              MR. DIONNE:  That's correct, you can

PERLIK and COYLE REPORTING

93

12:55:53   answer that.

12:55:54        Q.   (BY MR. DUDA)  I'll ask the question,

12:55:56   did you ever receive a letter from your attorney

12:55:58   regarding the registerability of the mark

12:56:01   WOOLFELT?

12:56:02        A.   I don't recall.

12:56:05        Q.   That is something that you could

12:56:07   certainly find out, correct?

12:56:09        A.   Right.

12:56:09        Q.   As you sit here, you don't recall

12:56:11   whether you've received such an opinion?

12:56:13        A.   Right.

12:56:47        Q.   Interrogatory number five on page three

12:56:49   of Exhibit 10 was also answered information not

12:56:57   known.  Let's try it.

12:56:59             Do you -- can you identify any person

12:57:02   who contributed to the creation of any sheep

12:57:08   design that is used by National Nonwovens?

12:57:10        A.   Any sleep design?

12:57:11        Q.   Yes.

12:57:12        A.   Not the original?

12:57:13        Q.   Any sheep design?

12:57:15        A.   Yes.

12:57:16        Q.   Who has been involved in the creation of

PERLIK and COYLE REPORTING

94

12:57:19    any sheep design by National Nonwovens as far as

12:57:22    you know?

12:57:22        A.   I have.

12:57:23        Q.   You have?  Anybody else?

12:57:26        A.   The original sheep design was created by

12:57:33    someone before my time.

12:57:35        Q.   You don't know who that is?

12:57:36        A.   I do not know who that is.

12:57:38        Q.   But you've been involved in some -- I'm

12:57:42    sorry, you've been involved in the creation of

12:57:44    some sheep design used by National Nonwovens?

12:57:46        A.   Yes.

12:57:46        Q.   Other than yourself, you know of no one

12:58:31    who is involved in the creation of any sheep

12:58:35    design that is used by National Nonwovens -- let

12:58:41    me ask the question again.  Other than yourself,

12:58:43    you don't know the identity of any other than

12:58:47    person who was involved in the creation of a sheep

12:58:49    design used by National Nonwovens, is that

12:58:51    correct?

12:58:52        A.   Correct.

12:58:58        Q.   Looking at interrogatory number six, my

12:59:43    understanding is that so far as you know, no one

12:59:49    at National Nonwovens knows the date of first use

PERLIK and COYLE REPORTING

12:59:52   of the term wool felt in connection with any

12:59:56   product marketed or sold by plaintiff?

12:59:59        A.   Correct.

12:59:59        Q.   STPHAOEUFPLT check the spelling of that

01:00:02   one with the interrogatory STPHAOEUFPLT just to

01:00:07   make sure that I'm understanding these answers

01:00:09   again.  With interrogatory number seven, do I

01:00:13   understand that response -- I'm sorry, do I

01:00:16   understand the response to interrogatory number

01:00:18   seven to mean that no one at National Nonwovens

01:00:21   can identify the products that were marketed or

01:00:24   sold in association or identified by the term

01:00:34   WOOLFELT -- W O O L F E L T as one word in

01:00:37   1982, '83, or '84?

01:00:38        A.   Correct.

01:00:38        Q.   Just to make sure that the question was

01:00:46   clear, my understanding the response a accurate,

01:00:51   by your answer, does that also mean that no one at

01:00:55   National Nonwovens can identify any product that

01:00:57   the Plaintiff marketed or sold in association with

01:01:01   the WOOL FELT mark in 1982, '83 or '84?

01:01:15        A.   One product; yes.

01:01:16        Q.   What one product?

01:01:19        A.   It was called 850.

96

01:01:31      Q.   Could you describe what 850 was?

01:01:33      A.   No.

01:01:42      Q.   I assume it was a felted wool product?

01:01:44      A.   Correct.

01:01:46      Q.   Was it a material?  Was it a desk lamp?

01:01:54  Do you have any idea what it was?

01:01:55      A.   It was a felted wool product of wool and

01:02:01  rayon.

01:02:01      Q.   That was sold in bulk?  Was it a bulk

01:02:08  product?

01:02:08              MR. DIONNE:  If you know.

01:02:09              THE WITNESS:  I don't know.

01:02:09      Q.   (BY MR. DUDA)  Do you know whether it

01:02:12  was like sold in the shape of a sheep or stylized

01:02:15  shape?

01:02:15      A.   I don't know.  It was before I was

01:02:17  there.

01:02:17      Q.   You just know there was something called

01:02:20  850?

01:02:21      A.   Correct.

01:02:21      Q.   Would your records at National Nonwovens

01:02:24  show what 850 was?

01:02:34      A.   I don't know if they were retained.

01:02:34      Q.   Why do you remember the 850?  What's the

PERLIK and COYLE REPORTING

97

01:02:41    basis of that knowledge -- since you weren't at

01:02:44    the company then?

01:02:44        A.   We went through a product elimination

01:02:54    and product description changes after our arrival

01:02:59    at National Nonwovens.

01:03:00        Q.   What did that mean in terms of product

01:03:05    850?

01:03:06        A.   There was different products that were

01:03:14    named numbers or letters and we converted them to

01:03:16    a new style system.

01:03:17        Q.   850 is one of the products that you

01:03:21    converted to a new style system?

01:03:23        A.   Yes.

01:03:23        Q.   And you recall converting 850 to a new

01:03:28    style system?

01:03:28        A.   Yes.

01:03:29        Q.   What did you convert it to?

01:03:30        A.   I don't know exactly.

01:03:31        Q.   But you do know that 850 was identified

01:03:34    by the WOOLFELT mark?

01:03:37        A.   Yes.

01:03:38        Q.   Is there any other reason why you would

01:03:43    remember that it's identified by the WOOLFELT

01:03:45    mark?

PERLIK and COYLE REPORTING

98

01:03:48     A.   No.

01:03:48     Q.   You just have this image?

01:03:51     A.   Yes.

01:03:51     Q.   Is there a document that shows the

01:03:53   WOOLFELT mark on this product?

01:03:55     A.   There were certain product numbers.  I

01:03:57   remember there was one that was called 3710

01:04:00   because it was a Super Bowl score.  Certain ones

01:04:04   stayed in my mind and 850 was one of them.

01:04:09     Q.   With WOOLFELT?

01:04:10     A.   Yes.

01:04:16     Q.   In number eight, interrogatory number

01:04:21   eight shown on Exhibit 10 -- that request asks for

01:04:26   respondent to state the date or dates of first use

01:04:29   by the Plaintiff of the sheep designs used by

01:04:31   plaintiff.  The answer is at least as early as

01:04:34   July, 1982?

01:04:35     A.   Yes.

01:04:35     Q.   What is the basis for that response?

01:04:37     A.   The literature that we found in the

01:04:43   files.

01:04:43     Q.   Anything else?  Was there anybody at the

01:04:49   company who remembered using this design back that

01:04:52   far?

99

01:04:52      A.   We had a ram design on the letterhead

01:04:59   when we first arrived there.  How far back that

01:05:02   goes, I do not know but we had no date for that.

01:05:09      Q.   Maybe I'm just misunderstanding your

01:05:12   response.  You arrived in the nineties?

01:05:14      A.   Right.

01:05:14      Q.   But this says as least as of July, 1982.

01:05:17   The basis of that response is not the letterhead?

01:05:19      A.   No.

01:05:20      Q.   It's other literature which is dated

01:05:23   July, 1982?

01:05:24      A.   Right.

01:05:24      Q.   Thank you.  Forgive me if I've asked the

01:06:15   question before and I don't think I've asked it

01:06:18   quite this way.  I don't think it would be overly

01:06:23   burdensome for me to ask it again.

01:06:25           Has nonwovens communicated with any

01:06:30   party other than CPE any assertion or statement

01:06:36   that the other party's use of the term WOOLFELT as

01:06:43   one word or WOOL FELT was two words, either

01:06:48   capitalized or not capitalized, may constitute a

01:06:52   violation of any trademark right of National

01:06:55   Nonwovens?

01:06:55      A.   No.


                 PERLIK and COYLE REPORTING

01:07:06                    MR. DIONNE:  I think --

01:07:08                    MR. DUDA:  I said other than CPE.

01:07:11                    MR. DIONNE:  The last time that

01:07:12    question came up, I believe we mentioned Hancock

01:07:20    Fabrics.

01:07:20                    MR. DUDA:  Well, I didn't

01:07:25    understand.

01:07:25                    MR. DIONNE:  Maybe I didn't

01:07:26    understand the question.

01:07:27        Q.   (BY MR. DUDA)  Did you communicate with

01:07:29    Hancock Fabrics that Hancock Fabrics' use of WOOL

01:07:35    FELT, whether one word or two words, whether

01:07:38    capitalized or not capitalized may constitute a

01:07:42    violation of National Nonwovens' trademark rights?

01:07:45        A.   Our attorney contacted them.

01:07:47        Q.   When I say you, I mean anybody on your

01:07:50    behalf?

01:07:50        A.   Yes.

01:07:51        Q.   So the communication with Hancock

01:07:53    Fabrics was that Hancock Fabrics' use of WOOLFELT,

01:07:59    either one word wore two words, may constitute a

01:08:05    violation of National Nonwovens' trademark rights,

01:08:08    is that correct?

01:08:08                    MR. DIONNE:  There's a letter which

PERLIK and COYLE REPORTING

01:08:10    I believe you produced from me to Hancock Fabrics

01:08:16    and I'll be very honest with you here, I don't

01:08:21    remember if we accused them of the infringement or

01:08:25    told them that CPE was infringing so I don't want

01:08:29    to confuse her and I think I have.

01:08:33        Q.   Let's carve that out, then.  Other than

01:08:35    that letter, we understand that that letter has

01:08:38    been shared between us so we can look at the

01:08:40    letter and see what it says?

01:08:41                MR. DIONNE:  Exactly.

01:08:42        Q.   (BY MR. DUDA)  Other than that letter,

01:08:44    has anyone at National Nonwovens or on behalf of

01:08:47    National Nonwovens contacted any party with the

01:08:53    allegation or assertion or statement that the

01:08:56    party's use of the term WOOLFELT is, either one

01:09:00    word or the two words, whether capitalized or not

01:09:03    capitalized may constitute a violation of National

01:09:09    Nonwovens' trademark rights?

01:09:10        A.   No.

01:09:13        Q.   Other than the specific letter that

01:09:16    Mr. Dionne was just referring to, has anyone at

01:09:23    nonwovens or on behalf of nonwovens contacted any

01:09:27    party with the assertion or allegation that its

01:09:32    use of any mark or symbol or design constitutes a

102

01:09:40   violation of nonwovens copyright rights?

01:09:43        A.

01:09:53        Q.   And that would be of course other than

01:09:55   CPE?

01:09:56        A.   No.

01:09:56        Q.   Again just to make sure we're both

01:10:04   there.  Other than the letter that Mr. Dionne is

01:10:10   speaking about, has there been any other

01:10:10   communication with Hancock Fabrics concerning

01:10:13   either a possible trademark violation or a

01:10:16   copyright violation from nonwovens?

01:10:19        A.   No.

01:10:19        Q.   Has Nonwovens granted any license to any

01:10:30   party to use the WOOLFELT mark?

01:10:36        A.   No.

01:10:36        Q.   Has Nonwovens granted a license to any

01:10:46   party to use any trademark which Nonwovens owns or

01:10:51   believes it owns?

01:10:52        A.   No.

01:10:53        Q.   Has Nonwovens granted any license to any

01:10:56   party to use any copyright which Nonwovens owns or

01:11:00   believes it owns?

01:11:01        A.   No.

01:11:25             MR. DUDA:  Let's mark this as

PERLIK and COYLE REPORTING

01:11:28   Exhibit 11.

                        (Defendant's Deposition Exhibit
                          No. X offered and marked.)
01:11:49

01:11:51       Q.   (BY MR. DUDA)  We've marked as Exhibit

01:11:53   11 from Arthur Dionne to Jeffery Berline dated

01:12:14   STPHAOEUFPLT get it from document STPHAOEUFPLT.

01:12:22   This letter, in the second paragraph, states

01:12:31   that -- states, in part, "it is our opinion that

01:12:37   your -- referring to CPE -- particular use of the

01:12:41   mark class particular wool felt is an infringement

01:12:45   of our client's federally protected trademark

01:12:49   rights.  Do you have an understanding of what your

01:12:51   counsel meant by your particular use of the mark

01:12:55   classic wool felt STPHAOEUFPLT get the right

01:12:57   spelling?

01:12:57       A.   Yes.

01:12:57       Q.   What is that understanding?

01:13:00       A.   My understanding is the use of classic

01:13:05   wool felt with their product is confusing to the

01:13:13   customer base in which we sell our product.

01:13:18       Q.   So your understanding of what was being

01:13:23   communicated, I think on behalf of CPE in this

01:13:26   case, is that particular use, it was meant CPE's

01:13:32   use of classic wool felt?

                        PERLIK and COYLE REPORTING

104

01:13:34     A.   Right.

01:13:35     Q.   You don't know of any particular way it

01:13:41   was being used other than the fact that it was

01:13:43   being used -- and that's probably not clear and I

01:13:48   apologize.

01:13:50          I don't know what particular use means.

01:13:52   I really don't and I didn't -- I just don't know

01:13:57   if there is something that you saw about the use

01:13:58   of classic wool felt that you don't like in the

01:14:04   way it was used or just the fact that it was used

01:14:09   as classic wool felt as shown in the letter with a

01:14:12   capital C, capital W and a capital F.  That's just

01:14:16   a background on where I'm going with this.  I'm

01:14:19   really just trying to understand?

01:14:21              MR. DIONNE:  Just to interject here,

01:14:24   Mrs. Centofanti is not a trademark  expert.

01:14:27              MR. DUDA:  I understand.

01:14:28              MR. DIONNE: And what she sees versus

01:14:33   what a trademark expert sees as what might be

01:14:39   considered likelihood of confusion may be two

01:14:42   different things and she relied upon counsel for

01:14:45   advice on that but if she has an understanding,

01:14:48   she can certainly tell you.

01:14:50              MR. DUDA:  I understand there's

PERLIK and COYLE REPORTING

01:14:51    legal issues involved in this and legal

01:14:53    discussions to be exchanged and all that.  But at

01:14:56    the heart of this matter, this isn't a

01:14:59    disagreement between lawyers, it's litigation

01:15:01    between two parties and somewhere, I'm just trying

01:15:05    to represent my client, really trying to get an

01:15:09    understanding of what as the Plaintiff is

01:15:11    complaining about what the Defendant is doing.  I

01:15:13    understand what Mr. Dionne is saying and I agree

01:15:17    with the legal issues.  You did indicate that you

01:15:22    had an understanding -- what your understanding of

01:15:24    what was meant by particular use of the mark

01:15:27    classic wool felt.  I just want to be as clear as

01:15:30    I can, from your understanding, what it is that

01:15:36    troubles you or troubles Nonwovens about the use

01:15:38    of classic wool felt.  My question is:  Is you

01:15:45    were talking about the particular use of the mark

01:15:47    classic wool felt.  Is it because the term or the

01:15:52    mark classic wool felt is used in connection with

01:15:56    CPE's product that you consider to be a violation

01:16:02    of your trademark rights.

01:16:29        A.    Repeat the question.  I got side

01:16:34    tracked.

01:16:34                MR. DUDA:  Could you read it back?

01:17:19      Q.    (BY MR. DUDA) Let me put it:  What is it

01:17:21    that Nonwovens objects to about the use of classic

01:17:27    wool felt by CPE STPHAOEUFPLT didn't read back

01:17:29    STPHAOEUFPLT?

01:17:29      A.    That it causes confusion to customers in

01:17:37    that when they purchase classic wool felt they may

01:17:41    think that they are purchasing our wool felt.

01:17:43      Q.    Do you know of any occasion on which any

01:17:57    party has expressed to you or anyone at Nonwovens

01:18:03    that the party was confused about -- confused as a

01:18:10    result of CPE's use of the classic wool felt term?

01:18:14      A.    No.

01:18:17      Q.    Do you know of any occasion in which any

01:18:27    party has expressed to you or to National

01:18:33    Nonwovens that the party was deceived by CPE's use

01:18:39    of the term or mark classic wool felt?

01:18:45      A.    Not to my knowledge.

01:18:46      Q.    Do you know of any occasion on which any

01:18:52    party was confused or deceived -- do you know of

01:18:56    any occasion in which any party has expressed to

01:18:58    you or anybody at National Nonwovens that it was

01:19:00    confused or deceived by CPE's use of the term or

01:19:05    mark imperial wool felt?

01:19:08      A.    Not to my knowledge.

107

01:19:09    Q.  Do you know of any occasion in which any

01:19:17    party expressed to anybody that the party was

01:19:21    confused or deceived by CPE's use of the term wool

01:19:26    felt.

01:19:26             MR. DIONNE:  Objection.  Only

01:19:28    because you're saying did any party express to

01:19:31    anybody?

01:19:35             MR. DUDA:  I'm just asking for her

01:19:38    personal knowledge.

01:19:38             MR. DIONNE:  Okay.

01:19:38    Q.  (BY MR. DUDA)  Your personal knowledge

01:19:40    of whether any party has expressed to any other

01:19:45    party that it was deceived or confused by CPE's

01:19:49    use of the term wool felt?

01:19:52    A.  Not to my knowledge.

01:20:13             MR. DUDA:  Let's mark this as the

01:20:16    next.

                     (Defendant's Deposition Exhibit
                       No. X offered and marked.)
01:20:49

01:20:50    Q.  (BY MR. DUDA)  I'm showing you a

01:20:51    document that we've marked as Exhibit 12, which

01:20:54    has on the upper left line crafts, wool, and

01:21:02    industrial felt and outdoor canvas by CPE felt.

01:21:07    It's a two-page document.  In the first full

PERLIK and COYLE REPORTING

01:21:13   paragraph -- I guess the second full par graph of

01:21:18   this document -- there's a statement that CPE's

01:21:20   craft and wool felts are available in a wide

01:21:23   variety of colors and textures designed to excite

01:21:27   and inspire the craft and quilt artisan.  In your

01:21:32   opinion does CPE's use of the term wool felts as

01:21:37   shown there violate any trademark rights?

01:21:39           MR. DIONNE:  Objection; calls for a

01:21:42   legal opinion and she's not qualified to give it.

01:21:44           MR. DUDA:  I understand.

01:21:45       Q.  (BY MR. DUDA)  In your lay opinion, does

01:21:49   that constitute a violation of any rights of CPE?

01:21:55           MR. DIONNE:  You're asking for her

01:21:56   opinion on a legal issue whether you call it lay

01:21:59   or anything else.  You couched this question in

01:22:02   terms of a legal issue.  She is not qualified to

01:22:05   answer that.

01:22:05           MR. DUDA:  Your objection is noted.

01:22:08   Want me to repeat the question?

01:22:11       Q.  (BY MR. DUDA)  In your opinion, does the

01:22:13   use of term wool felts as shown on this document,

01:22:19   constitute a violation of any rights of National

01:22:22   Nonwovens?

01:22:22       A.  Should I answer?

01:22:25            MR. DIONNE:  Yes; you can answer.

01:22:26            THE WITNESS:  In my opinion, yes.

01:22:28      Q.   (BY MR. DUDA)  It does?  Okay.  In your

01:22:32   opinion, does the use of the term wool felts as

01:22:36   shown in there likely to cause confusion among any

01:22:43   of your customers?

01:22:44      A.   Yes.

01:22:58      Q.   Do you believe that Nonwovens --

01:23:03   National Nonwovens has been damaged in any way by

01:23:06   CPE's use of the term wool felt?

01:23:11      A.   In my opinion?

01:23:13      Q.   Yes.

01:23:14      A.   Yes.

01:23:14      Q.   How has National Nonwovens been damaged

01:23:17   by CPE's use of the term wool felt?

01:23:22            MR. DIONNE:  This is interesting.

01:23:26   That's what we filed the lawsuit for, to find out

01:23:29   how badly we've been damaged.  If you want to ask

01:23:33   her about how she thinks we might have been

01:23:36   damaged, that's fine.

01:23:38            MR. DUDA:  I would hope if you filed

01:23:40   this lawsuit, you would agree that you've been

01:23:42   damaged, otherwise I don't know why you filed the

01:23:46   lawsuit.

PERLIK and COYLE REPORTING

01:23:47                    MR. DIONNE:  Infringement is a

01:23:48     damage.

01:23:49                    MR. DUDA:  In any event, I'm going

01:23:50     to ask the question.

01:23:51                    MR. DIONNE:  Ask the question.

01:23:53                    MR. DUDA:  I have a right to find

01:23:55     out if you're suing my client for money, I have a

01:23:58     right to know what the damages are.

01:23:59        Q.   (BY MR. DUDA)  Could you please describe

01:24:01     how Nonwovens was damaged by CPE's use of the term

01:24:06     wool felt?

01:24:06        A.   By just the term wool felt.

01:24:08        Q.   By its use of the term wool felt?

01:24:11        A.   By its use of the term wool felt, it is

01:24:18     causing our customers and consumers to believe or

01:24:23     possibly believe that the product that they are

01:24:25     purchasing from CPE is manufactured and it is our

01:24:30     wool felt product.

01:24:33        Q.   What evidence do you have of that?

01:24:35        A.   The evidence is that we have used the

01:24:43     term wool felt to identify our felted wool product

01:24:47     in a specific market, promoted that product as

01:24:53     wool felt.  It is identified out there, designers,

01:24:56     customers, consumers identify wool felt and

PERLIK and COYLE REPORTING

01:25:02    National Nonwovens' felted wool.  When they see

01:25:06    another product come out and it is not under a

01:25:09    different product name and they see the words wool

01:25:12    felt, that can cause them to think that that is

01:25:18    our product when it is not and we have no right in

01:25:22    terms of the quality of the product.  We don't --

01:25:26    can't guarantee anything about CPE's product.

01:25:29    It's not our product.

01:25:31        Q.   Do you have any -- other than what you

01:25:35    just said in terms -- I understand your rationale,

01:25:38    but do you have any evidence of any such damages

01:25:43    by National Nonwovens -- or that National

01:25:45    Nonwovens has suffered?

01:25:46        A.   No.

01:25:54        Q.   Do you believe that National Nonwovens

01:25:57    has been damaged by CPE's use of a sheep design?

01:26:03        A.   Yes.

01:26:04        Q.   Can you describe how you understand that

01:26:10    National Nonwovens has been damaged by CPE's use

01:26:14    of the sheep design?

01:26:14        A.   The sheep design has been used in

01:26:23    association with our wool felt product, our

01:26:27    customers, designers, have come to associate that

01:26:32    sheep design with National Nonwovens.  By using

01:26:35    that design closely mirroring our product line,

01:26:45    our descriptions, our suggestions, it again makes

01:26:49    them think that they -- when they purchase a CPE

01:26:53    product, that it is National Nonwovens' product

01:26:55    when, in fact, it is not.

01:26:57        Q.    Other than the description you just

01:27:11    provided, do you have any actual evidence of

01:27:17    damage that National Nonwovens as suffered due to

01:27:20    the use of CPE's sheep design?

01:27:23        A.    No.

01:27:31        Q.    Do you believe that National Nonwovens

01:27:37    has been damaged in any other way by CPE's use of

01:27:44    a trademark or copyright that National Nonwovens

01:27:49    owns?

01:27:49        A.    I don't understand your question, other

01:28:01    than -- what is different from the last two

01:28:05    questions.

01:28:05        Q.    I'm trying to find out if there is

01:28:07    anything more.  Let me try it this way.  Do you

01:28:10    believe that National Nonwovens has been damage by

01:28:14    CPE's use of any other mark or symbol that

01:28:22    National Nonwovens owns other than what we've just

01:28:25    identified?

01:28:29                    MR. DIONNE:  I'm going to suggest

PERLIK and COYLE REPORTING

01:28:31    that my client have a chance to look at the

01:28:33    complaint and she can pick up from the complaint

01:28:36    where we have all those answers.  I don't believe

01:28:40    she's quite capable with the legal expertise to

01:28:44    keep track in her mind all the aspects of the

01:28:47    complaint and that's, frankly, what you're asking

01:28:49    her about.  I think it's totally unfair that you

01:28:52    don't put the complaint in front of her and go

01:28:54    through it that way.

01:28:55            MR. DUDA:  I'm not really interested

01:28:57    in the complaint.

01:28:58        Q.   (BY MR. DUDA)  I'm interested in what

01:29:00    you know and what you believe.  I understand your

01:29:02    counsel prepared the complaint and I understand it

01:29:04    is there.  I just want to ask you the question one

01:29:06    more time?

01:29:07            MR. DIONNE:  How much longer are you

01:29:09    going to keep this up.  I'm getting hungry and so

01:29:12    is she.

01:29:13            MR. DUDA:  Can I just finish the

01:29:14    question.

01:29:14            MR. DIONNE:  Have you got a half an

01:29:16    hour, maybe we'll stay, but if you have two hours.

01:29:19            MR. DUDA:  We have a few more

PERLIK and COYLE REPORTING

114

01:29:22    minutes of this line of questioning.

01:29:23              MR. DIONNE:  I'm sorry to interrupt

01:29:25    you, then.

01:29:26         Q.  (BY MR. DUDA)  Let's ask the question

01:29:27    one more time.  Do you believe that Nonwovens has

01:29:30    been damaged by CPE's use of any other trademark

01:29:37    or copyrighted symbol that Nonwovens owns other

01:29:43    than the trademark and copyrighted item that you

01:29:46    just discussed?

01:29:46         A.  The items that we just discussed being

01:29:53    wool felt and the sheep design?

01:29:56         Q.  Yes?

01:29:56         A.  The boiled wool felt instructions.

01:30:00         Q.  How has National Nonwovens been damaged

01:30:07    by the, I guess CPE's use of boiled felt

01:30:15    instructions?

01:30:15              MR. DIONNE:  Jim, I'm sorry, I have

01:30:17    no object to this.  You're talking copyright,

01:30:20    there's statutory damages involved just for the

01:30:24    printing of these things.  She has no concept of

01:30:27    that and to try to ask her what the damages are

01:30:30    going to be, that's a legal question.  We have

01:30:33    experts who will testify to damages and I'm

01:30:35    just -- you can ask your questions, but they're

PERLIK and COYLE REPORTING

01:30:40    unfair.

01:30:40              MR. DUDA:  I think it's it's pretty

01:30:42    fair.  She's the party, not you.

01:30:44              MR. DIONNE:  You're unfair just

01:30:47    remember this, sir, it's a two edged sword,

01:30:50    whatever you do here, we'll come back.

01:30:53              MR. DUDA:  You are free to ask my

01:30:55    clients about the damages it has suffered.

01:30:57              MR. DIONNE:  Believe me, I am going

01:30:59    to.

01:30:59              MR. DUDA:  Let's stay with this edge

01:31:01    of the sword.  I'd like one more time to try to

01:31:05    get an answer from you as to what damages you

01:31:09    understand National Nonwovens has suffered as a

01:31:13    result of CPE's use of boiled felt instructions.

01:31:17        A.   In creating the boiled wool felt

01:31:23    instructions of our product, we opened up a

01:31:31    different use in media of the product thus

01:31:36    expanding the sales of the product.  CPE

01:31:41    replicated the instructions in a way that, again,

01:31:45    someone reading that would think that that was our

01:31:48    product, that they could do those things to our

01:31:51    product when, in fact, it was not our product.

01:31:53        Q.   Do you have any evidence of any party

116

01:32:00    who was actually confused by CPE's instructions?

01:32:07        A.    No.

01:32:07        Q.    Are there any other damages which you

01:32:19    are aware of that Nonwovens has suffered as a

01:32:23    result of any action or activity by CPE?

01:32:26        A.    I don't know.

01:33:06            MR. DUDA:  Let's just mark this as

01:33:08    the next exhibit because we've just been talking

01:33:10    about it.

                        (Defendant's Deposition Exhibit
                           No. X offered and marked.)
01:33:40

01:33:42        Q.    (BY MR. DUDA)  We've marked as Exhibit

01:33:43    13 a document that has the title boiled WOOLFELT

01:33:49    as one word, capital W, capital F instructions and

01:33:53    it shows from the bottom that's from Nonwovens.  I

01:33:56    believe you've seen this document before?

01:34:01    (Indicating.)

01:34:02        A.    Yes.

01:34:02        Q.    Could you explain what these

01:34:04    instructions are for?

01:34:05        A.    These instructions are for creating a

01:34:15    texture on our wool felt material and how to do

01:34:15    that.

01:34:15        Q.    It's for creating a texture?  It's not

PERLIK and COYLE REPORTING

01:34:24    for washing, for cleaning?

01:34:25        A.   No.

01:34:26        Q.   This is a process, you take new wool

01:34:36    felt and you run it through these -- this process

01:34:41    as described in these instructions and you get a

01:34:44    certain kind of texture from it?

01:34:45        A.   Right.

01:34:46        Q.   Just looking at this, starting with

01:34:54    number one, then, for this process, could you use

01:34:57    hot water instead of cold water as an alternative?

01:35:00        A.   You could.

01:35:04        Q.   What would happen if you used hot water?

01:35:08        A.   I don't know.

01:35:09        Q.   Why, if you know, do you suggest using

01:35:12    cold water?

01:35:12        A.   Because there may be a release of dye.

01:35:18    Cold water would minimize the dye release.

01:35:24        Q.   Why do you not rub or agitate?

01:35:26        A.   Because you'll continue to felt the

01:35:30    wool.

01:35:30        Q.   Which would cause what?

01:35:35        A.   You would not get that bumpy texture.

01:35:39    You would not -- the ultimate goal is to create a

01:35:42    texture in the material.

01:35:45      Q.   If you kept rubbing or agitating it, it

01:35:47   would make that texture go away?

01:35:50      A.   You would continue to felt the product

01:35:52   instead of creating the texture.

01:35:54      Q.   Then, why do you wet each color

01:35:58   separately?

01:35:59      A.   Release of dye.

01:36:00      Q.   You don't want one color to stain the

01:36:06   other color?

01:36:06      A.   Correct N. or the other part of the wool

01:36:09   felt.

01:36:09      A.   Correct.

01:36:09      Q.   Appeared then two, squeeze by hand to

01:36:14   remove as much water as possible.  Why do you do

01:36:17   that?

01:36:17      A.   Just a simple way to get the water out

01:36:22   of the product.

01:36:23      Q.   To start the drying process?

01:36:25      A.   Correct.

01:36:26      Q.   And if you didn't squeeze the water out,

01:36:29   it won't dry as fast, is that right?

01:36:31      A.   Correct.

01:36:31      Q.   Then it says avoid ringing as it may

01:36:36   stretch the material.  If you ring it, it would

01:36:38   kind of stretch it out of shape?

01:36:42        A.   Correct.

01:36:43        Q.   So you don't want to ring it, correct?

01:36:45        A.   Correct.

01:36:45        Q.   What about putting in a clothes dryer.

01:36:51   Couldn't you just hang it on a line?

01:36:54        A.   The clothes dryer is what helps get the

01:36:57   bumpy texture on it.

01:36:59        Q.   If you put it on the line, you wouldn't

01:37:02   get the bumpy texture or not as good a bumpy

01:37:05   texture?

01:37:06        A.   Right.

01:37:06        Q.   What's the fear about overdrying?  Why

01:37:13   do you not want to overdry?

01:37:16        A.   Wool will make it shrink.

01:37:18        Q.   As long as you don't overdry, you

01:37:21   probably won't shrink it?

01:37:23        A.   It will shrink but not as much.

01:37:31        Q.   Does it really matter whether you dry

01:37:33   the light colors separately from the darker

01:37:36   colors?

01:37:36        A.   They are wet so you may get the release

01:37:39   of dye or staining on the colors.

01:37:43        Q.   The color may change slightly during the

01:37:46   drying process, that's just a warning of what may

01:37:49   happen?

01:37:49        A.   Yes.

01:37:49        Q.   Could you just explain why that tip is

01:37:57   there, if excess dye remains in a dryer -- oh,

01:38:03   that's a tip -- if, after you dry this product,

01:38:07   and you take it out appeared there's still some

01:38:09   dye in the dryer, you put a wet towel in there and

01:38:13   it cleans it up?

01:38:14        A.   Correct.

01:38:14        Q.   Then, number four, lay flat to dry

01:38:20   complete plea smoothing fabric by hand.  What

01:38:24   happens if you don't lay it flat?

01:38:27        A.   It wrinkles.

01:38:28        Q.   Permanently?

01:38:37        A.   No; you can use an iron to get the

01:38:40   wrinkles out but then the bumpy texture goes away.

01:38:43        Q.   So that's -- you have large wrinkles may

01:38:52   be removed by using a light steam iron held over

01:38:56   the fabric.  You don't put the iron on the bumpy

01:39:03   fabric because it makes the bumpsy fabric go away?

01:39:07        A.   Right.

01:39:08        Q.   If you hold the iron on it and let the

01:39:12   steam go on to the fabric, it will smooth it out

PERLIK and COYLE REPORTING

01:39:15   and make the bumpy stuff go away?

01:39:15       A.   Repeat that question.

01:39:16       Q.   If you hold the iron above the surface

01:39:19   of the fabric, the steam will come out from the

01:39:22   iron and the steam itself will smooth out the

01:39:25   fabric without making the bumpy stuff go away?

01:39:28       A.   Correct.

01:39:31       Q.   Return felt to its original form by

01:39:34   pressing the steam iron?  What is that?  If you

01:39:38   want to sort of cancel out everything you've just

01:39:41   done?

01:39:41       A.   Right.

01:39:41       Q.   Why would you do that?

01:39:42       A.   They may not like the way it looks.

01:39:45       Q.   And you can start over again?

01:39:47       A.   Correct.

01:39:47       Q.   Who created these instructions?

01:40:03       A.   I did.

01:40:04       Q.   Really?

01:40:05       A.   Yes.

01:40:06       Q.   So this is created -- do you know

01:40:12   approximately when you drafted this?

01:40:13       A.   Approximately?

01:40:18       Q.   Yes.

122

01:40:18        A.   More than five years ago.

01:40:23        Q.   What did you base this on?  How did you

01:40:27   come up with this?

01:40:28        A.   Consumers look for something new and you

01:40:36   have a flat piece of fabric.  People like

01:40:40   textures.  This was a way of creating a texture to

01:40:43   a material opening up a whole other avenue of

01:40:50   usage.

01:40:50        Q.   The actual texture that you created was

01:40:54   a new kind of texture?

01:40:54        A.   Yes.

01:40:54        Q.   How did you find that?  How did you

01:41:00   discover this, just playing around with a washing

01:41:03   machine?  How did you discover this?

01:41:05        A.   The lab -- we have a laboratory a

01:41:10   quality lab and they were checking dye release of

01:41:13   material.

01:41:14        Q.   Dye releases?

01:41:16        A.   Yes.

01:41:20        Q.   So they made it wet?

01:41:24        A.   Correct.

01:41:24        Q.   And this kind of happened?

01:41:26        A.   Yes.

01:41:26        Q.   Did somebody report it to you?

PERLIK and COYLE REPORTING

01:41:31      A.   I don't recall.

01:41:32      Q.   Do you remember when you saw this new

01:41:35  product or new texture?

01:41:36      A.   I don't remember.

01:41:48      Q.   Did you work with somebody at the lab to

01:41:50  produce this?

01:41:50      A.   Yes.

01:41:51      Q.   Did you write out the instructions and

01:41:53  then give it to somebody else and see if you can

01:41:56  do it, following the instructions and see if they

01:41:59  can do it?

01:42:00      A.   Wrote the instructions out and told them

01:42:02  to do it so we could get the approximate shrinkage

01:42:06  the material.

01:42:08      Q.   Did you have to change the instructions

01:42:10  after somebody tried to follow up and do it?

01:42:13      A.   No; just the -- just to get the

01:42:17  shrinkage so they knew approximately how much

01:42:20  they'd lose on the material.

01:42:21      Q.   That's what you're referring to in the

01:42:23  results may vary paragraph of Exhibit 13?

01:42:26      A.   Correct.

01:42:26      Q.   The first time you wrote these

01:42:31  instructions down, you think you got it right?

PERLIK and COYLE REPORTING

124

01:42:34      A.   I don't remember.

01:42:35      Q.   You don't remember whether you had to

01:42:38 change them?

01:42:39      A.   No; I don't.

01:42:39      Q.   For these instructions, National

01:42:53 Nonwovens has a copyright registration, correct?

01:42:57           MR. DIONNE:  If you know.

01:42:58      Q.   (BY MR. DUDA)  Were you involved in any

01:43:01 discussions concerning the possibility of

01:43:02 registering a copyright of these instructions?

01:43:05      A.   Yes.

01:43:07      Q.   Without telling me the substance of any

01:43:12 discussions, just with whom did you have those

01:43:14 discussions?

01:43:15      A.   With my attorney.

01:43:16      Q.   Anybody else at National Nonwovens?

01:43:17      A.   No.

01:43:18      Q.   With your husband?

01:43:21      A.   No.

01:43:21      Q.   You had the authority to just go ahead

01:43:25 and get this registered?  You didn't have to

01:43:27 discuss it with anybody else?

01:43:28      A.   Correct.

01:43:30      Q.   Did anybody at National Nonwovens know

125

01:43:35   that you had filed a copyright registration for

01:43:38   these instructions before that registration had

01:43:40   happened?

01:43:40        A.   No.

01:43:58             MR. DUDA:  Let's mark this as

01:44:01   Exhibit 14.

                      (Defendant's Deposition Exhibit
                       No. X offered and marked.)
01:44:24

01:44:29        Q.   (BY MR. DUDA)  We've marked as Exhibit

01:44:31   13 a document that has various pages.  I think all

01:44:35   of which have been produced by your attorney to

01:44:39   us.  It's seven pages long.  I just put them

01:44:47   together as one exhibit for convenience for our

01:44:50   discussion. (Indicating.)

01:44:55        A.   (Witness examining document.)

01:44:55        Q.   Looking at page one of Exhibit 14, can

01:45:15   you just tell me what this is to your

01:45:18   understanding?

01:45:18        A.   This is a page off of our Website.

01:45:22        Q.   It concerns -- it has the apparent label

01:45:26   of Franny's features?

01:45:28        A.   Correct.

01:45:28        Q.   Who came up with the phrase Franny's

01:45:34   features?

PERLIK and COYLE REPORTING

01:45:34      A.   I did.

01:45:35      Q.   Who designed this sheet that's shown on

01:45:42  page one of Exhibit 14, do you know?

01:45:49      A.   The concept was mine and then I worked

01:45:52  with Cristin Ruge to come up with the sheep.

01:45:57      Q.   So Cristin did the actual drawing of the

01:46:00  sheep, the physical creation of it?

01:46:02      A.   I don't remember.

01:46:02      Q.   You may have?

01:46:04      A.   I may have; I don't remember.

01:46:07      Q.   Do you recall approximately when this

01:46:11  design came into existence?

01:46:13      A.   Approximately '98, '99.

01:46:20      Q.   Do you know whether or not you've

01:46:31  applied for registration of copyright on this

01:46:34  sheep as shown on page one of Exhibit 14?

01:46:36      A.   I do not know.

01:46:37      Q.   You just don't know whether you've

01:46:40  applied for it?

01:46:40      A.   No.

01:46:43      Q.   Going to page two of Exhibit 14, as I

01:46:57  believe it appears on that exhibit, in the upper

01:47:00  right-hand sector of page two there is a photocopy

01:47:07  of what appears to be a label, is that right?

PERLIK and COYLE REPORTING

01:47:09      A.   Correct.

01:47:10      Q.   Which shows eight sheep -- shows in part

01:47:13   eight sheep one of which is white and seven of

01:47:16   which are black, correct?

01:47:17      A.   Correct.

01:47:18      Q.   Is this a label that's still in use --

01:47:24   I'm sorry, is this a copy of a label that's still

01:47:28   in use by National Nonwovens?

01:47:29      A.   Yes.

01:47:29      Q.   Who designed these little sheep?

01:47:33      A.   I don't recall.

01:47:34      Q.   Do you know when they were designed?

01:47:40      A.   I'd say approximately the same time

01:47:45   Franny.  I don't recall exactly.

01:47:46      Q.   Can you narrow the possibilities on who

01:47:56   designed this?  Is it just one of a few people in

01:48:00   your opinion or could it have been anybody?

01:48:05      A.   It could have been Cristin.  I could

01:48:09   have mentioned it to her.  I don't recall.

01:48:11      Q.   You don't have any specific recollection

01:48:16   about the creation of these sheep in this format?

01:48:19      A.   Correct.

01:48:21      Q.   Did I understand you to just say that

01:48:27   you first used this design in the late nineties,

PERLIK and COYLE REPORTING

128

01:48:29   is that correct?

01:48:30      A.   Correct.

01:48:33      Q.   I bet mime right if I say you don't know

01:48:38   whether or not you got copyright registration for

01:48:40   these sheep, correct?

01:48:42      A.   Correct.

01:48:42      Q.   Page three, down in the bottom of page

01:48:50   three of Exhibit 14, you have another sheep

01:48:52   creature -- there's two of them that seem to be

01:48:56   pretty much identical.  Do you know what this

01:49:04   document is?

01:49:06      A.   It's an advertisement.

01:49:08      Q.   That would appear for example in a

01:49:10   magazine or something like that?

01:49:11      A.   Correct.

01:49:12      Q.   Who designed this sheep?

01:49:17      A.   I do not know.

01:49:18      Q.   Do you know when it was designed?

01:49:20      A.   No.

01:49:21      Q.   You don't know when this was first used

01:49:29   by National Nonwovens?

01:49:30      A.   No; the date of this is '82 so it would

01:49:33   be before that.

01:49:34      Q.   Again, I'm correct to state that you

PERLIK and COYLE REPORTING

01:49:43   don't know whether or not -- whether a copyright

01:49:46   registration has been filed for this design?

01:49:48        A.   I do not know.

01:49:50        Q.   On page four, and indeed where the four

01:50:02   got placed and I apologize for that, down in the

01:50:06   lower right-hand corner there seems to be a sheep

01:50:10   as on the previous page but this sheep has a

01:50:13   little stocking on her head, this page shows an

01:50:22   advertisement from a magazine, is that correct?

01:50:25        A.   Correct.

01:50:26        Q.   The date in the lower right-hand corner

01:50:30   shows it to be 1983 so is it correct to say you

01:50:34   don't know who designed this sheep?

01:50:36        A.   Correct.

01:50:36        Q.   And you don't know when it was designed?

01:50:38        A.   Correct.

01:50:38        Q.   You also don't know whether there's a

01:50:42   copyright registration, application that was filed

01:50:45   for this sheep?

01:50:46        A.   Correct.

01:50:46        Q.   Going to page five, on the left -- upper

01:51:01   left sector, there's a sheep shown under National

01:51:06   Nonwovens and above wool felt.  STPHAOEUFPLT see

01:51:10   how that's spelled from the exhibit STPHAOEUFPLT

PERLIK and COYLE REPORTING

130

01:51:13    this appears to be part of a larger ad.  Do you

01:51:17    know where this advertisement is placed or where

01:51:22    this is from?

01:51:22        A.    This was a mailing to customers.

01:51:25        Q.     Sort of a?

01:51:27        A.    Before a trade show.

01:51:31        Q.    And this would be 1998?

01:51:34        A.    Correct.

01:51:35        Q.    So you were likely involved in the

01:51:37    preparation of this ad?

01:51:38        A.    Correct.

01:51:38        Q.    What about the sheep?  Who designed the

01:51:43    sheep that's shown there?

01:51:44        A.    Again, I don't recall specifically who

01:51:47    designed that sheep.  It mirrored the label.

01:51:54        Q.    You're talking about page two?

01:51:55        A.    Page two.

01:51:56        Q.    This is -- in your opinion at least,

01:52:00    this sheep is essentially the same sheep or same

01:52:04    design as shown on page two?

01:52:05        A.    Right.

01:52:06        Q.    I guess whatever we said about page two

01:52:10    would apply to page five with respect to the sheep

01:52:12    design?

01:52:12      A.   Correct.

01:52:13      Q.   Then finally -- not quite finally, on

01:52:25    page six, this grouping again of eight sheep, one

01:52:28    of which is white, seven of which are black, is

01:52:36    what's shown on page six another copy of labels?

01:52:40      A.   Correct.

01:52:41      Q.   And the design that's shown on page six,

01:52:44    you understand these are essentially the same

01:52:46    design that's shown on page two of Exhibit 14?

01:52:49      A.   Correct.

01:52:52      Q.   Going to page seven of Exhibit 14, we

01:53:04    have three other sheep shown down near the bottom

01:53:10    of the page under country colors.  This is in

01:53:13    connection with -- appears to be an ad of

01:53:17    Commonwealth felt company?

01:53:19      A.   Correct.

01:53:19      Q.   This is an ad that was generated before

01:53:23    you became a part of the National Nonwovens?

01:53:26      A.   Correct.

01:53:26      Q.   So you don't know who designed these

01:53:30    sheep?

01:53:30      A.   Correct.

01:53:30      Q.   You don't know when they were designed?

01:53:32      A.   Correct.

132

01:53:33      Q.   And you don't know the circumstances

01:53:34   surrounding the adoption of this design by

01:53:38   Commonwealth?

01:53:38      A.   Correct.

01:53:38      Q.   You don't know whether or not these --

01:53:42   this design has a copyright application?

01:53:46      A.   Correct.

01:54:02            MR. DUDA:  I would say we are done.

01:54:04            MR. DIONNE:  No questions.

01:54:12            MR. DUDA:  Subject to a couple of

01:54:14   disputes or disagreements we have about

01:54:16   Ms. Centofanti testimony, which you may have to

01:54:20   come back to deal with, otherwise we are done.

01:54:28            (The deposition was concluded.)

                        *****